

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-3-2009

# In Re: Winstar Comm

Precedential or Non-Precedential: Precedential

Docket No. 07-2569

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"In Re: Winstar Comm " (2009). *2009 Decisions.* Paper 1812.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1812

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 07-2569

_____


IN RE: WINSTAR COMMUNICATIONS, INC.,
Debtor


CHRISTINE C. SCHUBERT, Chapter 7 Trustee

v.

LUCENT TECHNOLOGIES INC.,
Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 06-cv-00147)
District Judge: Honorable Joseph J. Farnan, Jr.

_____

Argued October 27, 2008

Before: SLOVITER, GREENBERG, Circuit Judges,
and IRENAS,* Senior District Judge

(Filed: February 03, 2009)

_____

_____

*  Honorable Joseph E. Irenas, Senior United States District
Judge for the District of New Jersey, sitting by designation.

Craig Goldblatt , Esq. (Argued)
Wilmer Hale
1875 Pennsylvania Avenue, N.W.
Washington, DC  20006

 Attorney for Appellant

Andrew C. Gold,  Esq.
David R. King,  Esq.
Stephen M. Rathkopf, Esq. (Argued)
Herrick Feinstein
2 Park Avenue
New York, NY 10016

 Attorneys for Appellee

Robert K. Rasmussen, Esq.
University of Southern California
Gould School of Law
699 Exposition Blvd.
Los Angeles,  CA 90089

 Attorney for Amicus-Appellant

G. Eric Brunstad, Jr., Esq.
Bingham McCutchen
One State Street
Hartford, CT  06103

 Attorney for Amicus-Appellee

_____

OPINION OF THE COURT

_____

SLOVITER, Circuit Judge.

 This appeal, arising out of the self-described "strategic partnership" between Winstar Communications, Inc. (the

bankrupt corporation) and Lucent Technologies Inc. (one of Winstar's primary creditors and suppliers), presents us with an issue of first impression - when a creditor can be considered a non-statutory insider for purposes of extending the time for recovery of preferential payments. Ordinarily, a trustee may recover transfers made by the debtor within ninety days of the bankruptcy, but the Bankruptcy Code authorizes a trustee to recover any transfers made within a year of the bankruptcy if the creditor was an "insider."[1] We must determine whether Lucent may be deemed an "insider" of Winstar for purposes of the Bankruptcy Code and, if so, whether the Bankruptcy and District Courts properly held that the Trustee was entitled to recover approximately $188 million from Lucent as an avoidable preference payment. We also must determine whether those courts properly held that Lucent breached its contract with one of Winstar's subsidiaries and that Lucent's claims against Winstar's estate should be equitably subordinated to those of Winstar's other creditors and certain equity interest holders.

## I.

### Procedural Background

Winstar Communications, Inc. ("Winstar") and its wholly-owned subsidiary Winstar Wireless, Inc. ("Wireless") filed voluntary petitions for reorganization pursuant to Chapter 11 of the Bankruptcy Code on April 18, 2001 (the "Petition

---

[1] See 11 U.S.C. § 547(b) ("[T]he trustee may avoid any transfer of an interest of the debtor in property–(1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt . . . ;(3) made while the debtor was insolvent; (4) made . . . between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;" and (5) the creditor  receives more than otherwise permissible under Chapter 7); 11 U.S.C. § 550(a) ("[T]o the extent that a transfer is avoided under section [547] of this title, the trustee may recover, for the benefit of the estate, the property transferred . . . .").

3

Date"). "In January 2002 the cases were converted to Chapter 7 and shortly thereafter Christine C. Shubert (the "Trustee") was appointed as the Chapter 7 trustee." Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.), 348 B.R. 234, 244 (Bankr. D. Del. 2005).

Winstar initially commenced this adversary proceeding against Lucent Technologies Inc. ("Lucent") on the Petition Date, "alleging that [Lucent] breached several of the contracts between Winstar and Lucent, [thereby] allegedly forcing Winstar to file its bankruptcy petition." Shubert v. Lucent Techs., Inc., (In re Winstar Commc'ns, Inc.), No. 01-01430, 2004 WL 2713101, at *1 (D. Del. Nov. 16, 2004). In turn, "Lucent filed several proofs of claim, asserting claims against Winstar that include secured and unsecured claims for sums alleged due under agreements between Lucent and Winstar" totaling nearly one billion dollars.[2] Id. Following conversion of the case into a Chapter Seven liquidation, the Trustee interceded into this adversary proceeding and filed the Second Amended Complaint (the controlling complaint in this appeal). Id. After the Trustee voluntarily dismissed certain claims and the Bankruptcy Court granted Lucent dismissal of another, the Trustee had three remaining claims: "Count VII for Breach of the Parties' Subcontracting Arrangement," "Count X for Return of Preferential Transfer," and "Count XI, a claim seeking to equitably subordinate Lucent's claims." Id.[3]

_____

[2] The Trustee and Lucent have entered into a series of stipulations that recognize the validity of Lucent's secured claims against the Winstar estate and provide that Lucent is entitled to approximately $21 million subject to the resolution of this adversary proceeding.

[3] The Bankruptcy Court had subject matter jurisdiction over the initial proceedings pursuant to 28 U.S.C. § 1334(b). The District Court's jurisdiction for the bankruptcy appeal is found in 28 U.S.C. § 158(a)(1). We have jurisdiction over this appeal under 28 U.S.C. § 158(d). We exercise plenary review over the District Court's appellate review of the Bankruptcy Court's decision and exercise the same standard of review as the District Court in

Lucent made a demand for a jury trial and asserted four counterclaims for fraud and negligent misrepresentation. Lucent subsequently requested the District Court to exercise its discretionary power to withdraw this case from the Bankruptcy Court under 28 U.S.C. § 157(d) because of its right to a jury trial on the contract and preference claims. The District Court denied Lucent's request, holding that by submitting a proof of claim against Winstar, Lucent "triggered the process of allowance and disallowance of those claims," thereby subjecting Lucent to the equity power of the Bankruptcy Court. 2004 WL 2713101, at *3. Finally, the Court declined to exercise its discretion to withdraw the reference, citing In re Pruitt, 910 F.2d 1160, 1168 (3d. Cir. 1990), and ruled that Lucent violated Local Bankruptcy Rule 5011-1, which provides that "the movant for withdrawal shall concurrently file with the Clerk a motion for a determination by the Bankruptcy Court with respect to whether the matter . . . is core or non-core." Id. Thereafter, the Bankruptcy Court held a trial on the Trustee's claims and Lucent's counterclaims. The Bankruptcy Court found for the Trustee on all her claims. It rejected all of Lucent's counterclaims (which Lucent does not contest on appeal).

On the Trustee's preference claim, the Bankruptcy Court held that Winstar's payment to Lucent on December 7, 2000, of the proceeds of a loan Siemens made to Winstar was an avoidable preference and therefore ordered Lucent to return those funds to the Trustee. Because that transaction occurred more than ninety days before Winstar filed for bankruptcy, the transaction was avoidable only if Lucent was an "insider" of Winstar. The Bankruptcy Court, after discussing the statutory definition of an "insider" as including a "person in control of the debtor," 11 U.S.C. § 101(31), as well as case law regarding the non-statutory category of insiders, held that Lucent was an insider of Winstar. The Bankruptcy Court rejected Lucent's argument that Winstar lacked "an interest" (as required by

_____

reviewing the Bankruptcy Court's determinations. Fellheimer, Eichen & Braverman, P.C. v. Charter Tech., Inc., 57 F.3d 1215, 1223 (3d Cir. 1995).

5

§547(b)'s prefatory language) in the Siemens loan and rejected Lucent's "new value defense" to the preference claim.

Next, the Bankruptcy Court equitably subordinated Lucent's claims against the Winstar estate to the claims of all of Winstar's other creditors and certain equity interest holders.

Finally, on the Trustee's breach of contract claim, Lucent challenged the Bankruptcy Court's authority to issue a final judgment with respect to that claim, which Lucent contended was "non-core." See 28 U.S.C. § 157(c)(2) (providing that bankruptcy courts can enter final judgments on non-core matters only with the consent of the parties). Ultimately, the Bankruptcy Court rejected Lucent's challenge to its ability to issue final orders on several grounds. First, the Bankruptcy Court found that Lucent "waived its objection to this Court's entry of final orders by its conduct," 348 B.R. at 250, because "[f]rom before the filing of the withdrawal motion, through the conclusion of the Trustee's case-in-chief in this Court when Lucent then unsuccessfully sought judgment on partial findings pursuant to Fed. R. Bankr. P. 7052, until after submission of all the evidence, and indeed, submission of each party's proposed findings of fact and conclusions of law[,] . . . Lucent did not raise the issue that the Bankruptcy Court lacked jurisdiction to enter final judgment," id. at 244-45. Indeed, the Court noted that "Lucent sought a final order in its favor on several occasions from this Court." Id. at 245. Second, the Bankruptcy Court "interpret[ed] the district court's earlier findings [regarding Lucent's motion to withdraw the reference] that the claims and counterclaims fall within the claims allowance process to necessitate a finding that these actions are core pursuant to 28 U.S.C. § 157(b)(2)(B)." Id. at 246. See 28 U.S.C. § 157(b)(2)(B) ("Core proceedings include . . . allowance or disallowance of claims against the estate . . . .").

Third, the Bankruptcy Court made an "independent examination of its own jurisdiction" and concluded that the Trustee's Subcontract claim was a core claim under § 157(b)(2)(B). Id. Lucent filed a proof of claim that stated that "Lucent held a secured claim (and to the extent not secured, an

6

unsecured claim) in [a]n amount not less than $138,957,218.90 for goods sold, money loaned, and other." Id. at 247. "Lucent described the documents which support its claim as the Supply Agreement . . . and any and all related documents, agreements and statements of work." Id. (emphasis added in original) (internal quotations omitted). Thus, the Bankruptcy Court concluded that "[w]hether Lucent may have breached the Subcontract by refusing to pay [in March 2001] has a direct bearing upon whether Lucent may recover under its Proof of Claim and if so, in what amount. Therefore the breach of the Subcontract claim falls within the core jurisdiction of the Court." Id.

On the merits of the Subcontract claim, the Bankruptcy Court held that Lucent breached the Subcontract by its refusal to pay Wireless approximately $62 million for services rendered between January and March 2001.[4]

Lucent subsequently appealed the Bankruptcy Court's decision to the District Court, which affirmed. See Lucent Technologies, Inc. v. Shubert (In re Winstar Commc'ns, Inc.), No. 06-147-JJF, 2007 WL 1232185 (D. Del. August 26, 2007).

The parties do not disagree as to the relevant facts. They vigorously disagree as to the legal effect of these facts and the conclusions reached by both the Bankruptcy and District Courts.

## II.

### Facts

Prior to its bankruptcy, Winstar was a publicly traded Delaware corporation that provided local and long distance telecommunications services. During the 1990s, Winstar was also engaged in the construction of a global broadband

---

[4] We express our deep appreciation to Joel B. Rosenthal, the visiting Bankruptcy Judge from the District of Massachusetts, who treated this matter with great dedication.

telecommunications network.  Initially, its subsidiary Wireless was primarily responsible for the design and construction of this network.  Lucent, which was spun off by AT&T, is a publicly traded Delaware corporation that "designs and delivers telecommunications systems, services, and products, including software."  348 B.R. at 252.

Before the arrangements at issue here, Winstar and Lucent had an arm's-length vendor-creditor relationship in which Lucent sold goods to Winstar.  In October 1998, Winstar entered into what the parties describe as a "strategic partnership" with Lucent in order to further Winstar's network construction.  348 B.R. at 252.  As described below, Lucent essentially agreed to help finance and construct Winstar's global broadband telecommunications network.

In October 1998, Lucent and Winstar entered into a secured credit agreement (the "First Credit Agreement").  Lucent provided a two billion dollar line of credit "to be used for the purchase of certain products and services in exchange for a lien in virtually all of Winstar's assets."  348 B.R. at 252.  Simultaneously, Lucent and Winstar entered into the Supply Agreement, under which "Lucent would build and deliver a turnkey operation to Winstar, " i.e. Lucent would take primary responsibility for the construction of Winstar's network.  348 B.R. at 253.  Lucent was also required to provide "Best of Breed" equipment.  348 B.R. at 253.  Where Lucent could not provide "Best of Breed" equipment or perform services necessary for the construction of Winstar's network, Lucent was obligated to finance (pursuant to the First Credit Agreement) such equipment or services provided by third parties.  However, the Supply Agreement provided that 65% of the equipment and services Winstar purchased during the first year of the contract would be from Lucent and 70% thereafter.  Winstar would face escalating surcharges of up to three million dollars per year if it failed to meet these purchase requirements.

In sum, under the October 1998 agreements Winstar obtained financing for its network construction and Lucent obtained a major customer for its products and services.  Even at

that time, Lucent and Winstar "recognized that Lucent did not have all the core competencies necessary to perform the [network] buildout." 348 B.R. at 253. "Therefore the Supply Agreement provided that Lucent would prepare a transition agreement that included a schedule of its assumption of various aspects" of the network construction. 348 B.R. at 253. However, no transition agreement was ever completed. Instead, Lucent and Winstar's subsidiary Wireless entered into an agreement effective January 4, 1999, (the "Subcontract") under which "Wireless agreed to act as Lucent's subcontractor and build the network at least until such time as Lucent was willing and able to assume that role." 348 B.R. at 253.

In May 2000, Winstar obtained a $1.15 billion revolving credit and term loan from a consortium of bank lenders (the "Bank Facility"), which was secured by Winstar's assets. By this time, Winstar had also raised almost one billion dollars in equity and $1.6 billion in public debt. Using funds from the Bank Facility and these other sources, Winstar paid off the approximately $1.2 billion it had borrowed from Lucent under the First Credit Agreement. Lucent then released its lien on Winstar's assets.

This transaction did not end Lucent's financing of Winstar's network construction. As the Bankruptcy Court found: "Lucent desired to keep its good customer relationship with Winstar and thus in May 2000, simultaneously with the execution of the Bank Facility and repayment of the $1.2 [billion] owed under the First Credit Agreement, the parties entered into the Second Credit Agreement whereby Winstar received from Lucent a $2 billion line of credit with the ability to borrow up to $1 billion at any one time." 348 B.R. at 254. Winstar created two subsidiaries, WVF-1 LLC ("WVF-1") and WVF-LU2 LLC ("WVF-LU2"), to act as borrowers under the Second Credit Agreement. Lucent received a security interest in the borrowing subsidiaries' assets and a security interest senior to the Bank Facility for equipment financed by Lucent. However, the Second Credit Facility, unlike the First, was not secured by a lien on all of Winstar's assets. Finally, the Second Credit Agreement also contained the following financial

9

covenants: (1) Winstar would "not permit its total Capital Cash Expenditures ('CAPEX') to exceed $1.3 billion in any year prior to and including 2001," (2) Lucent was entitled "to serve a 'refinance notice' on Winstar if the outstanding loans exceeded" $500 million, and (3) Winstar was required to use "any increases in the Bank senior loan arrangement . . . to repay Lucent." 348 B.R. at 254-55.

The preceding agreements formed the contractual basis for the relationship between Winstar and Lucent. The Bankruptcy Court, which conducted a 21-day bench trial, reviewed 1,400 exhibits, and heard 39 witnesses, made extensive factual findings of Lucent's control over Winstar. In its overview, the Bankruptcy Court concluded that Lucent used "Winstar as a mere instrumentality to inflate Lucent's own revenues." 348 B.R. at 284. It noted that "what began as a 'strategic partnership' to benefit both parties quickly degenerated into a relationship in which the much larger company [Lucent] bullied and threatened the smaller [Winstar] into taking actions that were designed to benefit the larger at the expense of the smaller." 348 B.R. at 251. It stated further, "taking all the credible evidence as a whole, it is clear that Lucent used Winstar to inflate Lucent's own revenues." 348 B.R. at 251 (emphasis deleted). The opinion continues:

> Although Winstar benefitted from some of its dealings with Lucent and its own actions were, at times, no less questionable than Lucent's, the facts point to one conclusion: Lucent extracted what it needed to prop up its own revenue from Winstar in the form of purchases by Winstar of unneeded equipment and manipulated the timing of a refinancing notice that would have put the world on notice that Winstar was in dire financial straits until Lucent could take some more. Lucent used its position as Winstar's lender to ensure Winstar's cooperation by repeated threats to stop both the funding of Winstar's draw requests and the payment of Wireless's invoices for services already performed.

Id.

10

The Bankruptcy Court found that Lucent "controlled many of Winstar's decisions relating to the buildout of [its] network;" "forced the 'purchase' of its goods well before the equipment was needed and in many instances . . . never needed at all;" and "treated Winstar as a captive buyer for Lucent's goods." 348 B.R. at 280. It noted that "Lucent's ability to involve Winstar's employees in Lucent['s] duplicity is further evidence of Lucent's control." Id.

The Bankruptcy Court also found that "these parties were not dealing at arms [sic] length" in light of various transactions between the parties, such as a purchase order "describing as 'miscellaneous' a purchase of several million dollars," the agreement to purchase unneeded software, other excessive end-of-quarter deals, and "unneeded equipment paid for by Winstar but sitting in Lucent's facilities, duplicate charges, and difficulty, to say the least, in getting credits correctly to Winstar's accounts." Id. at 266-67. The Bankruptcy Court also drew an adverse inference against Lucent based on the refusal of two Lucent employees to answer deposition questions regarding Lucent's relationship with Winstar. Id. at 280-82.

As noted above, we must deal with three claims: the Trustee's preference claim, the contract claim, and the claim for equitable subordination.

## III.

### Discussion

A.   The Preference Claim

An understanding of the Trustee's claims for recovery of the $188.2 million payment to Lucent requires a detailed description of the Siemens loan and certain end-of-quarter and bill-and-hold transactions between Lucent and Winstar deemed irregular by the lower courts.

In November 2000, Siemens, a competitor of Lucent in the manufacture of telecommunications equipment, agreed to

11

join the Bank Facility and lend $200 million to Winstar. According to the Siemens loan documents, the Siemens loan was to be used for "general corporate purposes." App. at 2056. However, the Second Credit Agreement with Lucent obligated Winstar to pay any such increase in the Bank Facility to Lucent. Failure to do so would constitute an event of default under the Second Credit Facility. Moreover, under a cross-default provision in the Bank Facility, default on the Second Credit Agreement would constitute default on the Bank Facility.

Winstar sought permission from Lucent to keep all, or alternatively half, of the Siemens loan proceeds notwithstanding the above requirements of the Second Credit Agreement. As found by the Bankruptcy Court, "Lucent refused and responded with a . . . 'consent letter' that was merely a list of demands." 348 B.R. at 271. Moreover, after "Winstar did not immediately agree to Lucent's demands, Lucent put the transition agreement negotiations on hold." 348 B.R. at 272. Finally, "[w]hen Winstar still did not acquiesce, Lucent played its ultimate trump card: give Lucent all of the Siemens proceeds or there would be no further draws under the Second Credit Agreement." 348 B.R. at 272.

Winstar agreed to pay the proceeds of the Siemens loan to Lucent and informed the Bank Facility lenders that it would use the Siemens loan as well as other capital raised at about the same time to reduce its debt to Lucent. On December 7, 2000, Winstar "closed on a $200 million increase [in] its syndicated loan with Bank of New York [the agent of the bank facility]," and "[o]n the same day Winstar paid, by wire transfer, Lucent $188,180,000 [the Siemens loan minus certain fees and a refund owed to Winstar by Lucent] to reduce Winstar's outstanding loan with Lucent." 348 B.R. at 272. It is this payment of almost $188.2 million that the Trustee characterized as an avoidable preference.

The Bankruptcy Code provides that "to the extent that a transfer is avoided under section [547] of this title, the trustee may recover, for the benefit of the estate, the property transferred . . . .". 11 U.S.C. § 550(a). The referenced section,

12

11 U.S.C. § 547(b) provides:

> [T]he trustee may avoid any transfer of an interest of the debtor in property--
>     (1) to or for the benefit of a creditor;
>     (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>     (3) made while the debtor was insolvent;
>     (4) made--(A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>     (5) that enables such creditor to receive more than such creditor would receive if--(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Because the Siemens transaction occurred more than ninety days prior to the Petition Date, § 547(b)(4) can be satisfied only if Lucent was an insider of Winstar. Lucent contends that the lower courts erred in so holding. Lucent also argues that the proceeds of the Siemens loan were "earmarked" for Lucent such that no "interest of the debtor in property" was present. Finally, Lucent argues that the lower courts improperly denied its new value defense pursuant to 11 U.S.C. § 547(c)(4).

Although at least one of our sister Courts of Appeals has held that the "determination of insider status is a question of fact . . . subject to the clearly erroneous standard of review," Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.), 926 F.2d 1458, 1466 (5th Cir. 1991), we believe that the issue is best characterized as a mixed question of law and fact. Cf. Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.), 531 F.3d 1272, 1275 (10th Cir. 2008) (characterizing insider status as a mixed question where "the facts are undisputed and the issue revolves around the legal conclusion drawn from the facts against the backdrop of a statute"). Thus, we will review

13

the Bankruptcy Court's findings for clear error but exercise "plenary review of the lower court's interpretation and application of those facts to legal precepts." Schlumberger Res. Mgmt. Servs., Inc. v. Cellnet Data Sys., Inc. (In re Cellnet Data Sys., Inc.), 327 F.3d 242, 244 (3d Cir. 2003).

Under the statute, "[t]he term 'insider' includes . . . (B) if the debtor is a corporation–(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B). Additionally, in light of Congress's use of the term "includes" in § 101(31), courts have identified a category of creditors, sometimes called "non-statutory insiders," who fall within the definition but outside of any of the enumerated categories. See In re U.S. Med., 531 F.3d at 1276.

The Bankruptcy Court held that Lucent was an insider of Winstar under § 101(31)(B)(iii)'s "person in control" language and as a non-statutory insider. Lucent argues that the lower courts applied the incorrect legal standard under § 101(31) and, further, that the evidence was insufficient to support a finding of insider status.

The principal issue presented is the legal standard for "insider." Lucent asserts that, in order for a creditor to constitute an "insider" as either a "person in control" or a non-statutory insider, that creditor must exercise "actual managerial control over the debtor's day-to-day operations." Appellant's Br. at 32-33. According to Lucent, the term "person in control" and the scope of the non-statutory insider category both "should be interpreted in light of the other statutorily enumerated 'insiders'" such that "the evidence would have to demonstrate that Lucent exercised the type of authority over Winstar that an officer, director, or general partner exercises–actual managerial control over the debtor's day-to-day operations." Appellant's Br. at 32. In support of that argument, Lucent cites to only one decision by an Article III court, Butler v. David Shaw, Inc., 72 F.3d 437, 443 (4th Cir. 1996) (holding, apparently under the non-statutory

14

category, that to constitute an insider, an entity "must exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets") (quoting Hunter v. Babcock (In re Babcock Dairy Co.), 70 B.R. 662, 666 (Bankr. N.D. Ohio 1986)). However, Butler relied entirely on In re Babcock Dairy for this proposition and the quoted language interpreted the "person in control" statutory insider category, not the non-statutory insider category. 70 B.R. at 666 (holding, in the context of the "person in control" category, that although no "standard has been established for determining the degree to which a person must control a debtor before he is considered . . . an insider . . . it does appear that the person . . . must exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets"). Butler is unpersuasive.

The Trustee contends that the "person in control" and non-statutory insider categories are subject to different legal standards. As to "person in control" insider status, the Trustee argues that managerial control is sufficient but not necessary. As to non-statutory insiders, the Trustee argues that "actual control is not required." Appellee's Br. at 33. See In re U.S. Med., 531 F.3d at 1277 n.5 ("The 'control' to which [non-statutory insider] cases refer can only correctly be interpreted as something short of actual, legal control over the debtor's business because 'actual control' would subject the creditor to the statutory category of 'person in control of the debtor' under [§ 101(31).] Any interpretation of 'control' within the non-statutory-insider context as anything like the ability to 'order, organize or direct' the debtor's operations is simply incorrect.") (citations omitted). Instead, the Trustee argues that, in considering non-statutory insiders, courts conduct "a factual inquiry into the debtor's relationship with the alleged insider, including whether the debtor and the alleged insider dealt at arms [sic] length." Appellee's Br. at 34 (quoting In re Craig Sys. Corp., 244 B.R. 529, 539 (Bankr. D. Mass. 2000)). See generally 5 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy, § 547.03[6] (15th rev. ed. 2008) ("The consideration of insider status focuses on two factors: (1) the closeness of the relationship between the parties; and (2)

15

whether the transaction was negotiated at arm's length.").

We agree with Lucent that actual control (or its close equivalent) is necessary for a person or entity to constitute an insider under § 101(31)'s "person in control" language.[5] However, a finding of such control is not necessary for an entity to be a non-statutory insider. See In re U.S. Med., 531 F.3d at 1279 ("A finding of actual control by the bankruptcy court would make Creditor a statutory insider and would avoid the question of whether it was a non-statutory insider altogether. Obviously, then, a bankruptcy court does not have to find actual control of the debtor by the creditor before ruling that the creditor is a non-statutory insider of the debtor."). To hold otherwise would render meaningless Congress's decision to provide a non-exhaustive list of insiders in 11 U.S.C. § 101(31)(B) because the "person in control" category would function as a determinative test. Lucent persuasively argues that "to avoid turning the catch-all 'non-statutory' category into an end-run around Congress's intent–making superfluous the specific, narrow categories Congress identified–that catch-all category must be reserved for persons and entities that are functionally equivalent to the types of insider enumerated in the statute." Appellant's Reply Br. at 11.

However, Lucent glosses over the fact that not all of the enumerated insiders possess actual control over the debtor. For example, a "relative of a general partner, director, officer, or person in control of the debtor" is an insider. 11 U.S.C. § 101(31)(B)(vi). Similarly, a "partnership in which the debtor is a general partner" is an insider–even though the direction of control is reversed, i.e. the debtor as general partner controls the partnership. 11 U.S.C. § 101(31)(B)(iv). Cf. 11 U.S.C. § 101(31)(E) (providing that an "affiliate" of the debtor is an

---

[5] Indeed, the Bankruptcy Court applied this standard: "There must be day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake." 348 B.R. at 279 (quoting In re Armstrong, 231 B.R. 746, 749-50 (Bankr. E.D. Ark. 1999)).

16

insider, even though an affiliate under § 101(2)(B) includes a corporation "20 percent or more of whose outstanding voting securities are directly or indirectly owned . . . by the debtor"). In light of these enumerated categories, we hold that it is not necessary that a non-statutory insider have actual control; rather, the question "is whether there is a close relationship [between debtor and creditor] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length." In re U.S. Med., 531 F.3d at 1277. See also S. Rep. No. 95-989, at 25 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5810 ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at [arm's] length with the debtor.").

The Bankruptcy Court's extensive findings regarding Lucent's ability to coerce Winstar into transactions not in Winstar's interest amply demonstrate Lucent's insider status. For example, the Bankruptcy Court found that Lucent "controlled many of Winstar's decisions relating to the buildout of the network;" "forced the 'purchase' of its goods well before the equipment was needed and in many instances . . . never needed at all;" "treated Winstar as a captive buyer for Lucent's goods;" and used Winstar as "a means for Lucent to inflate its own revenue." 348 B.R. at 280. The Bankruptcy Court also found that "Lucent's ability to involve Winstar's employees in [certain improper transactions that benefitted Lucent] is further evidence of Lucent's control." Id.

Throughout this period, Lucent was interested in ensuring that its financial records show a rosy picture. To this end, it focused on the quarterly reports that it reported publicly and to the financial authorities. The Bankruptcy Court found that "Winstar repeatedly and knowingly helped Lucent by making massive, last minute, allegedly unneeded purchases that were arranged by Lucent as the ends of quarters approached." 348 B.R. at 255. These deals "enabled Lucent to report more revenue and appear more profitable in its quarterly public reports than it really was." Id. Indeed, "Winstar's purchases of Lucent equipment in end of quarter sales [were] on average eight times

17

as high as . . . Winstar purchases of Lucent equipment in months in which a quarter did not end." Id. The Bankruptcy Court also found that "Winstar helped Lucent record revenue through alleged accounting schemes such as improper bill and hold deals, whereby Winstar would pay for goods that it did not need, often were not identified with any kind of particularity, and frequently never even left the Lucent warehouse." Id. The Bankruptcy Court concluded that "Winstar was and remained Lucent's captive purchaser of unneeded and sometimes unidentified goods to permit Lucent to inflate its own revenue." 348 B.R. at 267.

One of the egregious examples of Lucent's power to coerce Winstar is demonstrated by the transaction termed the Software Pool Agreement by the Bankruptcy Court. In September 2000, Lucent applied "pressure on Winstar to help Lucent make its end of quarter numbers." 348 B.R. at 259. Although Lucent was aware that Winstar executives were "vehement that they are out of money and do not want to spend money on products that they can not immediately utilize," there were high-level discussions between Lucent and Winstar executives, during which Winstar's President and Chief Operating Officer Nate Kantor offered to "help whenever possible" on end of quarter deals and instructed another Winstar executive, David Ackerman, to make a deal. Id. at 260. In light of the CAPEX provision in the Second Credit Agreement that limited Winstar's capital expenditures, Ackerman expressed discomfort in reaching the $110-115 million target that Lucent sought but told Kantor that "[t]here is not much I can give them that we really need, but there are some creative things I can do that can get us close to their number without being totally stupid." Id. at 260-61. Ultimately, Lucent forced Winstar to pay it $135 million "for software it did not need, did not use, and had a fair market value of substantially less than the contract price." 348 B.R. at 255.

The Bankruptcy Court found several irregularities in the Software Pool Agreement. First, "Lucent's [i]nitial software proposal was for a much smaller amount–$25 million–but in less than nine days . . . the pool expanded approximately five-fold . . .

18

without the numerous internal studies" typically prepared by Winstar. 348 B.R. at 263. Second, Winstar agreed to pay the list price for the software, even though it was contractually entitled to a lower price. Third, the Bankruptcy Court found that "less than $20 million [of the software purchase] was of value to Winstar." Id. Fourth, "[t]o enable Winstar to make the required cash payment for the software, the companies agreed to enter into contracts for credits postdated after September 29, 2000 and payable in the fourth quarter of 2000 (i.e., before Winstar was obligated to actually make the software payments to Lucent)." Id. This postdating enabled "Lucent to book almost the entire amount of the software deal as revenue in [the] final fiscal quarter of 2000," meaning that "Lucent funded Winstar's purchase of the unnecessary software in advance, to obtain Lucent's September 2000 revenue and profit infusion." Id. As Lucent concedes, its accounting treatment of this transaction was improper. It conducted an internal investigation, revised its projected revenue announcement, reported the matter to the SEC, and ultimately paid "a substantial fine." Appellant's Br. at 17.

These purchases "forced Winstar out of compliance with the CAPEX covenant and over the $500 million refinancing threshold" under the Second Credit Agreement, thereby entitling Lucent to issue a refinancing notice. 348 B.R. at 262-63. The Bankruptcy Court found that Lucent subsequently "deliberately held up" the issuance of a refinancing notice under the Second Credit Agreement, which the Bankruptcy Court characterized as "the equivalent of a financial death knell," in order "to ensure that the [Siemens loan and certain private equity investments] occurred and new equity was infused into the dying Winstar." Id. at 284. In sum, given this course of conduct, the Bankruptcy Court found that the "parties were not dealing at arms [sic] length." Id. at 266.[6]

---

[6] Lucent objects to the adverse inference the Bankruptcy Court drew against Lucent based on the refusal under the Fifth Amendment of two Lucent executives to answer deposition questions about the relationship between Lucent and Winstar.

Lucent contests the sufficiency of these findings to support the conclusion that it was an insider. It argues that rather than exercising actual control over Winstar, it simply used its superior bargaining position "to push Winstar to purchase as much Lucent equipment as Winstar was willing to take." Appellant's Br. at 39. It contends that Winstar's management "determined that it was in Winstar's best interests to maintain a good relationship with their principal supplier, Lucent." Appellant's Br. at 40. As to the Siemens loan transaction, Lucent argues that, given its contractual right to those proceeds under the Second Credit Agreement, "the preference statute [cannot] penalize Lucent for conduct that was wholly permissible under the parties' freely entered agreements." Appellant's Br. at 41.

Lucent's contention that it was merely driving a hard bargain and exercising its contractual rights is not persuasive. The decision of the bankruptcy court in <u>Johnson v. NBD Park Ridge Bank</u> <u>(In re Octagon Roofing)</u>, 124 B.R. 522, 530 (Bankr. N.D. Ill. 1991), provides an instructive contrast. There, the alleged insider creditor required the debtor to provide a mortgage on certain property in order to secure a previously unsecured debt; if the debtor refused, the creditor "could have, and would have, effectively shut down Debtor's operations." 124 B.R. at 530. The bankruptcy court held that the creditor was not a "person in control of the debtor" because these facts "merely demonstrate that the [creditor] could compel payment of its debt" and "it is well established that the exercise of financial control . . . incident to the creditor-debtor relationship[] does not make the creditor an insider." <u>Id.</u> Here, however, the Bankruptcy Court's findings are not limited to Lucent compelling payment of debts or other financial concessions "incidental" to the Credit Agreements. Instead, the Bankruptcy Court found, among other things, that Lucent had the ability to

---

Because we believe that the Bankruptcy Court's factual findings are more than sufficient to demonstrate that Lucent was an insider of Winstar even without considering the Bankruptcy Court's adverse inference, we do not consider the adverse inference issue.

coerce Winstar to make unnecessary purchases and used "Winstar as a mere instrumentality to inflate Lucent's own revenues." 348 B.R. at 284.

Moreover, given our conclusion that actual control is unnecessary for an entity to be deemed a non-statutory insider, even if Lucent was not a "person in control" of Winstar, it was a non-statutory insider of Winstar based on the Bankruptcy Court's findings. Not only was Lucent both a major creditor and supplier of Winstar, but, according to the Bankruptcy Court, it had the ability to coerce Winstar into a series of transactions that were not in Winstar's best interests, such as the Software Pool transaction, the improper bill-and-hold transactions, and other purchases of unneeded equipment. Such one-sided transactions refute any suggestion of arm's-length dealings. See In re U.S. Med., 531 F.3d at 1277 n.4 ("An arm's-length transaction is a transaction in good faith in the ordinary course of business by parties with independent interests . . . [that] each acting in his or her own best interest[ ]would carry out . . . .") (quotation omitted).

Lucent counters that the totality of the parties' relationship suggests that both were able to obtain concessions from the other–and therefore, they were engaged in arm's-length dealings. Lucent points to certain of the Bankruptcy Court's findings in support of this argument: Lucent engaged in the "pass-through" transactions as an accommodation to Winstar, which obtained favorable accounting benefits from the practice; Lucent funded more non-Lucent equipment than called for under the Supply Agreement and did not impose contractually-authorized penalties based on those purchases; and Winstar sought out a strategic partnership with Siemens, one of Lucent's competitors. These findings may suggest that Lucent did not exercise actual control over Winstar. But cf. In re S. Beach Sec., Inc., 376 B.R. 881, 889 (Bankr. N.D. Ill. 2007) ("To be an insider of the debtor [as a person in control], a person need not have legal or absolute control of the debtor.") (quotation omitted). However, the Bankruptcy Court's findings demonstrate that Lucent had come to dominate the parties' relationship by December 7, 2000 (the date on which the alleged

21

preferential transfer occurred).[7]  Therefore, we cannot conclude that the Bankruptcy Court's finding that the parties did not deal at arm's length was clearly erroneous and we hold that Lucent was a non-statutory insider of Winstar.  Therefore, the Trustee was not limited to the ninety-day look back but could recover Winstar's payment of $188.2 million to Lucent which occurred within the year prior to the bankruptcy.

Lucent interposed several defenses to the Trustee's preference claim.  In addition to its contention that the Bankruptcy Court's factual findings do not establish actual control, it argued that the payment to Lucent was earmarked and thus was not a transfer of Winstar's property.  "The earmarking doctrine is entirely a court-made interpretation of the statutory requirement that a voidable preference must involve a 'transfer of an interest of the debtor in property.'" McCuskey v. Nat'l Bank of Waterloo (In re Bohlen Enters., LTD.), 859 F.2d 561, 565 (8th Cir. 1988) (quoting 11 U.S.C. § 547(b)).  Under this doctrine, "[w]hen . . . funds are provided by [a] new creditor to or for the benefit of the debtor for the purpose of paying the obligation owed to [an existing] creditor, the funds are said to be 'earmarked' and the payment is held not to be a voidable

---

[7] Indeed, none of the facts cited by Lucent undermine the Bankruptcy Court's finding that the parties were not engaged in arm's length dealings.  For example, as to the Siemens loan, the Bankruptcy Court found that "Lucent deliberately held up the refinancing notice [permitted under the Second Credit Agreement] to ensure that the Siemans [sic] refinancing occurred and new equity was infused into the dying Winstar" for Lucent's benefit. 348 B.R. at 284.  Similarly, the Bankruptcy Court found that Lucent never "developed the core competencies needed for it to assume the buildout" of Winstar's network, id. at 259–suggesting that Lucent simply could not supply the equipment contemplated by the Supply Agreement.  Finally, Lucent pushed back against the pass-through transaction structure under the Subcontract in September 2000, and used those objections to force Winstar into approximately $200 million worth of end-of-quarter transactions that largely involved unneeded equipment.

preference." Id.

The following are requirements for the earmarking doctrine: "(1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt, (2) performance of that agreement according to its terms, and (3) the transaction viewed as a whole . . . does not result in any diminution of the [debtor's] estate." Id. at 566. We review the Bankruptcy Court's findings for clear error and its legal conclusions de novo. Cf. In re Cellnet Data Sys., 327 F.3d at 244.

Although the Bankruptcy Court ultimately reached the merits of Lucent's earmarking defense, it held in the alternative that Lucent waived earmarking because Lucent (1) stipulated that 11 U.S.C. § 547(b)(1) was satisfied and (2) failed to plead earmarking as an affirmative defense. 348 B.R. at 272-73. We agree with Lucent that these conclusions were erroneous. As to the stipulation, the statutory language underlying earmarking ("an interest of the debtor in property") is not contained in § 547(b)(1), but rather precedes the enumerated subsections of § 547(b). Therefore, Lucent's stipulation did not cover earmarking.

As to the affirmative defense conclusion, as the Ninth Circuit has held, "the earmarking doctrine is not an affirmative defense under [Fed. R. Civ. P.] 8, but rather a challenge to the trustee's claim that particular funds are part of the bankruptcy estate." Metcalf v. Golden (In re Adbox, Inc.), 488 F.3d 836, 842 (9th Cir. 2007). Because the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, "the trustee has the burden of establishing [under § 547(b)] that property is part of the bankruptcy estate." In re Adbox, 488 F.3d at 842; see 11 U.S.C. § 547(g). Where, as here, "the trustee establishes that the transfer of the disputed funds was from one of the debtor's accounts over which the debtor ordinarily exercised total control . . . the trustee makes a preliminary showing of an avoidable transfer 'of an interest of the debtor' under § 547(b). The burden then shifts to the defendant in the preference action to show that the funds were

23

earmarked." Id.

Turning to the merits, the Bankruptcy Court held that earmarking was inapplicable because there was no agreement between Winstar and Siemens that the proceeds of the Siemens loan would be used to repay Lucent. 348 B.R. at 273. Lucent argues that the Bankruptcy Court was "clearly wrong" in finding no agreement between Siemens and Winstar because the Second Credit Agreement required Winstar to use the proceeds of any additional debt incurred under the Bank Facility to pay down its debt to Lucent, and the Bank Facility listed the "fail[ure] to pay any Indebtedness . . . in an amount of $25.0 million or more when due" as an event of default. App. at 1997. Thus, Lucent concludes that the bank agreement "required Winstar to use the Siemens loan proceeds to pay Lucent," Appellant's Br. at 51, and Siemens was aware of this requirement because Winstar sent a memorandum to all lenders under the Bank Facility (including Siemens) notifying them that Winstar intended to utilize "up to $200 million of proceeds from the Additional Capital," which included the Siemens loan, "to repay outstandings under the credit agreement with Lucent," App. at 2052.

Notwithstanding the vigor with which Lucent presents its earmarking contention, it has not shown that the Bankruptcy Court's finding that there was no agreement between Siemens and Winstar was clearly erroneous. Siemens' corporate representative testified that "Winstar could use that [loan] for whatever its corporate purposes were," App. at 2849, and language in the amendment to the Bank Facility which added Siemens to that lending group also provided that the loan was "for general corporate purposes," App. at 2056. Cf. Reigle v. Mahajan (In re Kumar Bavishi & Assocs.), 906 F.2d 942, 944 (3d Cir. 1990) (rejecting earmarking where "record does not reflect the existence of an agreement [between the new creditor and debtor] that the funds be used to pay a specified antecedent debt"); In re AmeriServe Food Distrib., Inc., 315 B.R. 24, 30-31 (Bankr. D. Del. 2004) (finding no agreement and thus no earmarking where new creditor provided loan "for general corporate purposes").

24

Moreover, Winstar's memorandum to the Bank Facility lenders did not clearly indicate that Winstar intended to use the Siemens loan specifically to repay Lucent. That document stated that Winstar would use "Additional Capital" to repay Lucent and defined "Additional Capital" to include significant funds other than the Siemens loan (such as $270 million in a private equity investment and $500 million in an equipment leasing facility). Most importantly, even if Siemens knew that Winstar would use the loan to repay Lucent, there is no evidence to demonstrate that Siemens required Winstar to do so. Indeed, as noted above, the clear language of the Siemens loan documents did not require Winstar to use the loan to repay its antecedent debt to Lucent. Cf. Cadle Co. v. Mangan (In re Flanagan), 503 F.3d 171, 185 (2d. Cir. 2007) ("[W]e have been . . . clear that where a new creditor provides funds to the debtor with no specific requirement as to their use, the funds do become part of the estate . . . . This result does not change even where the new creditor knows, but does not require, that the new loan funds will be used to pay off a preexisting debt.") (internal citations omitted).

In sum, Siemens was (at most) aware that the Second Credit Agreement between Lucent and Winstar required Winstar to pay the proceeds of the Siemens loan to Lucent and that Winstar intended to do so. Although Lucent is correct that a failure to do so would have ultimately led to an event of default under the Bank Facility, that merely implies that the Bank Facility lenders (including Siemens) could have brought breach of contract claims against Winstar–not that Siemens conditioned its loan on Winstar's payment to Lucent. Thus, the Bankruptcy Court properly held that earmarking was inapplicable.

Apparently recognizing that its earmarking contention may not defeat the Trustee's $188.2 million claim in its entirety, Lucent next argues that it is entitled to a $90.7 million new value defense. Under the Bankruptcy Code, a trustee may not avoid a transfer

> to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the

25

benefit of the debtor--(A) not secured by an otherwise unavoidable security interest; and (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(c)(4). New value includes "money or money's worth in goods, services, or new credit." 11 U.S.C. § 547(a)(2). Lucent bears the burden of proving its new value defense. 11 U.S.C. § 547(g).

This court has held that § 547(c)(4) imposes three requirements: (1) "the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b);" (2) "after receiving the preferential transfer, the preferred creditor must advance 'new value' to the debtor on an unsecured basis;" and (3) "the debtor must not have fully compensated the creditor for the 'new value' as of the date that it filed its bankruptcy petition." New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.), 880 F.2d 679, 680 (3d Cir. 1989) (emphasis in original). As explained by one treatise, "[a]lthough there is no requirement that the [new value] be extended as a result of the previously received preference, the rationale of this section treats the [new value] as if it were, in effect, a return of the preference, restoring the previous depletion of the estate." 4 William J. Norton Jr., Norton Bankruptcy Law and Practice § 66:36 (3d ed. 2008). We defer to the Bankruptcy Court's factual findings regarding Lucent's new value defense unless they were clearly erroneous. In re New York City Shoes, 880 F.2d at 682.

Lucent contends that it "provided Winstar with $90.7 million of unsecured new value after December 7, 2000 [the date of the Siemens transaction], in the form of: (1) $28.4 million in equipment and related services for which Winstar never paid; and (2) a $62.3 million loan that Winstar drew from Lucent under the Second Credit Agreement on December 29, 2000, and did not repay." Appellant's Br. at 55. The Bankruptcy Court rejected Lucent's new value defense because Lucent provided any such new value "on a secured basis, as is evidenced by the Security Agreements dated May 9, 2000, and December 22, 2000, and as admitted by Lucent in its . . . secured proof of claim

26

and the escrow fund stipulations." 348 B.R. at 283 (internal citations omitted). Indeed, the Trustee and Lucent entered into stipulations "which recognize the validity of Lucent's security interests and provide for distribution to Lucent of the proceeds of the sale of Winstar assets that were subject to Lucent's lien." Id. Moreover, the Bankruptcy Court found that "Lucent . . . failed to show that [the new value] was provided after the receipt by Lucent of the preferential transfer." Id. (emphasis in original).

We agree with Lucent that it has demonstrated that the equipment and services underlying the $28.4 million were delivered after the date of the Siemens transaction (December 7, 2000). Lucent employee Vernon Terrell testified that this equipment was shipped between December 8, 2000, and April 18, 2001, App. at 2662-63, and invoices for the equipment at issue show that the "ship date" for all of the equipment was December 8, 2000, or later. Indeed, the Trustee does not even address this issue in her brief and appears to concede the point. Thus, the Bankruptcy Court's contrary finding was clearly erroneous.

On the other hand, the Bankruptcy Court found that this new value was secured, a finding Lucent contends was erroneous. Of course, if the equipment was the subject of a prior security interest possessed by Lucent, it could not be part of new value purportedly provided by Lucent. As noted above, it was Lucent's burden to prove its new value defense, and we conclude that it has failed to satisfy its burden of proof to show that the $28.4 million was unsecured. When Lucent filed its secured claim, it listed certain equipment that was covered by the security agreements dated May 9, 2000 and December 22, 2000 that was owned by Winstar's subsidiaries WVF-1 and WVF-LU2. In fact, the record shows that Lucent included almost all of the equipment claimed as new value as part of its secured claim against Winstar. Compare App. 1216-17 (invoice numbers for equipment underlying secured claims) with App. 2210-2332 (invoices underlying $28.4 million in alleged new value). Moreover, the Trustee and Lucent entered into three related settlements that recognize the validity of Lucent's

27

security interests for purposes of the bankruptcy proceedings and expressly provide that "all of Lucent's secured claims against the Debtors' estates [i.e. Winstar and its subsidiaries] have been resolved" in exchange for approximately $21 million. App. at 1412. That is, for purposes of these bankruptcy proceedings, the combined effect of Lucent's security agreements, proof of claim and the parties' stipulations is that Lucent failed to show that the equipment underlying its $28.4 million new value defense was unsecured. Cf. Norton Bankruptcy Law and Practice at § 66:36 (noting that § 547(c)(4) "requires a . . . determination of whether the security interest is valid in bankruptcy. If it is not, the creditor will lose the benefit of the security interest, but will be able to use the entire [new value] to protect a prior preference."). Thus, we cannot conclude that the Bankruptcy Court clearly erred in concluding that Lucent provided the $28.4 million in alleged new value on a secured basis. Consequently, Lucent cannot claim a new value defense as to the $28.4 million in equipment and related services.

Lucent also failed to meet its burden of proof with respect to its new value defense as to the payment on December 29, 2000 of $62.3 million. This payment was part of a "pass-through" transaction between Winstar, Lucent, and Wireless that involved three steps: (1) Winstar borrowed funds from Lucent under the Second Credit Agreement (2) in order to pay Lucent for services under the Supply Agreement, (3) which in turn paid Wireless for its services pursuant to a subcontract between Lucent and Wireless. As to the first step in the transaction, Lucent has failed to show that this loan was unsecured. Indeed, Lucent had a security interest in the equipment and services financed pursuant to the $62.3 million loan payment under the Second Credit Agreement and related security agreements, and does not appear to argue otherwise.

Instead, Lucent contends that, even if the $62.3 million alleged new value was subject to a security interest, Lucent was undersecured at the time it provided such new value. Thus, Lucent argues that it is entitled to a setoff to the extent that any new value exceeds the value of its security interests.

28

Although the authorities disagree as to whether an undersecured creditor is entitled to a new value defense,[8] we need not decide the issue because Lucent has failed to demonstrate that it was undersecured at the time of the $62.3 million loan at issue.  Indeed, Lucent's evidence before the Bankruptcy Court suggested that Winstar was solvent at and about the time of the alleged new value transfer, and therefore Lucent could not have been undersecured at that time.  Although the Bankruptcy Court rejected that evidence and found that Winstar was insolvent (a finding not at issue on appeal), the Trustee notes that the Bankruptcy Court's findings suggest that Winstar had assets of approximately $3 billion in December 2000.  348 B.R. at 277-78.  Moreover, Lucent's reliance on the value of the assets underlying its secured claim at the time that Winstar liquidated its holdings is unpersuasive because a liquidation sales price does not represent the value of the assets at the time Lucent provided the alleged new value.

As to the second step of the transaction, the payment flowed from Winstar to Lucent for services under the Supply Agreement, not from Lucent.

Finally, as to the third step of the transaction, Lucent's payment to Wireless was simply a payment on an antecedent debt for services provided by Wireless to Lucent.  New value in services is deemed to be provided when the services are performed.  See In re U.S. Interactive, Inc., 321 B.R. 388, 394 (Bankr. D. Del. 2005) ("Value is deemed given on the date the services are performed.").  Here, Lucent failed to offer any

---

[8] Compare Collier on Bankruptcy at § 547.04[4] n.46 ("If the creditor extending the credit is partially secured by a valid security interest, then the exception only applies to the extent that the creditor's collateral is less than the total claim against the debtor resulting from the extension of credit."), with Norton Bankruptcy Law and Practice at § 66:36 ("[T]he emerging view is that [the] plain meaning of the statute does not distinguish between fully and partially secured advances and that § 547(c)(4)(A) simply disqualifies any new value that is secured.") (quotations omitted).

29

evidence to demonstrate that these services were provided after December 7, 2000 (the preference date), and therefore Lucent failed to satisfy its burden of proof as to its new value defense on this basis as well.

In sum, we conclude that the Bankruptcy Court properly denied Lucent its new value defense under § 547(c)(4) because Lucent failed to carry its burden of proof as to both components of its new value theory. We therefore will affirm the Bankruptcy Court's decision, approved by the District Court, that the Trustee may recover the $188.2 million paid to Lucent.

B.      The Contract Claim

We turn next to the Trustee's claim that Lucent breached its subcontract with Wireless, a claim that the Bankruptcy Court accepted and for which it awarded the Trustee more than $62 million. Before we discuss this claim, we must first consider Lucent's challenge to the Bankruptcy Court's jurisdiction to enter final judgment on this claim.

A bankruptcy court may enter final judgments only to "core proceedings" absent consent of the parties. 28 U.S.C. § 157(b)-(c). This court has adopted a two step process to determine whether a claim is a core proceeding. See Halper v. Halper, 164 F.3d 830, 836 (3d Cir. 1999). First, "a court must consult § 157(b)" to determine if the claim at issue fits within that provision's "illustrative list of proceedings that may be considered 'core.'" Id. If so, "a proceeding is core [1] if it invokes a substantive right provided by title 11 or [2] if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case." Id. (quotation omitted).

Even if a claim is not a core proceeding, a bankruptcy court may still have jurisdiction over the claim if the claim is "related to a case under title 11," i.e. the Bankruptcy Code. 28 U.S.C. § 157(c)(1). However, the bankruptcy court (absent consent of the parties not present here) may only submit "proposed findings of fact and conclusions of law" that are subject to de novo review by the district court. 28 U.S.C. §

157(c)(1).  We have held that a claim falls within the bankruptcy court's "related to" jurisdiction if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."  Halper, 164 F.3d at 837 (quotation omitted).

The Bankruptcy Court held that the Trustee's breach of contract claim was "core" because that claim had a "direct bearing upon whether Lucent may recover under its Proof of Claim and if so, in what amount."  348 B.R. at 247.  See 28 U.S.C. § 157(b)(2) ("Core proceedings include . . . allowance or disallowance of claims against the estate . . . .").[9]  Lucent contends that, under N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982), "it would violate Article III to permit an Article I bankruptcy court to enter final judgment . . . in a contract action by the estate that arises solely under state law and implicates no federal statutory or regulatory regime."  Appellant's Br. at 74.

We need not adopt the conclusion of the Bankruptcy Court that the Trustee's breach of contract claim is a core proceeding because in our view that claim was within the Bankruptcy Court's jurisdiction as "related to" the Trustee's case under Title 11.  Lucent filed proofs of claim against Winstar and its subsidiaries.  Moreover, as noted by the Bankruptcy Court, Lucent's proofs of claim "described the documents which support its claims as the Supply Agreement, any amendments thereto and any and all related documents, agreements and statements of work.  The Subcontract is certainly an agreement related to the Supply Agreement; it is the means by which

---

[9] The Bankruptcy Court also held that Lucent, by its conduct, consented to the issuance of a final order by the Bankruptcy Court on the breach of contract claim.  However, Lucent persuasively distinguishes the authority on which the Bankruptcy Court relied for that alternative holding because, unlike the cases cited by the Bankruptcy Court, Lucent objected in its Answer to the issuance of a final order on the breach of contract claim.

Lucent was to fulfill its obligation to perform the network buildout." 348 B.R. at 247. (quotations omitted). That is, in order to determine whether Lucent is entitled to recover on its proofs of claim, and if so, in what amount, the Bankruptcy Court had to determine whether Lucent breached its obligations under the Subcontract. Any amount that Lucent was entitled to recover against Winstar would, in essence, be offset by any amount that Lucent failed to pay under the Subcontract.[10] Thus, the Trustee's breach of contract claim falls within § 157(c)(1) because resolution of that claim "could conceivably have [an] effect on the estate being administered in bankruptcy." Halper, 164 F.3d at 837. Although the Bankruptcy Court could not enter a final judgment on the claim if supported only by its "related to" jurisdiction, the Bankruptcy Court expressly stated that "to the extent that . . . this Court may only enter proposed findings and rulings . . . the following constitutes the Court's proposed findings and rulings." 348 B.R. at 243. Thereafter, the District Court upheld the Bankruptcy Court's resolution of the Trustee's breach of contract claim after "reviewing the decision of the Bankruptcy Court under a plenary standard of review." 2007 WL 1232185, at *6 (emphasis added). Thus, even assuming that the Bankruptcy Court could not enter a final judgment as to the breach of contract claim, the lower courts complied with the necessary procedures for cases based on a bankruptcy court's "related to" jurisdiction. See 28 U.S.C. § 157(c)(1).[11]

---

[10] We also note that Lucent's course of conduct under the Subcontract (e.g. its repeated threats to refuse payment in order to coerce Winstar's purchase of unneeded equipment) was also relevant to the hierarchical ordering of creditors because it helped form the basis for the Bankruptcy Court's conclusions that Lucent was an insider and consequently that the Trustee was entitled to recover on her preference claim and that equitable subordination was appropriate.

[11] Lucent points to one sentence in the Bankruptcy Court's opinion where it stated that "the Bankruptcy Court's factual findings and conclusions of law . . . are . . . not clearly erroneous." 2007 WL 1232185, at *7. A review of the District Court's opinion and its express statement that it applied "a plenary standard of

32

Finally, Lucent contends that it is entitled to a jury trial on the Trustee's breach of contract claim under the Seventh Amendment. However, the Supreme Court has held that when a creditor files a proof of claim, the creditor brings itself "within the equitable jurisdiction of the Bankruptcy Court" such that the creditor is "not entitled to a jury trial on [a] trustee's preference action"–even though, absent the filing of the proof of claim, a creditor is entitled to a jury trial on such a claim–because "the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's equity jurisdiction." Langenkamp v. Culp, 498 U.S. 42, 44-45 (1990) (per curiam). See also Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 59 n.14 (1989) ("[B]y submitting a claim against the bankruptcy estate, creditors subject themselves to the court's equitable power to disallow those claims, even though the debtor's opposing counterclaims are legal in nature and the Seventh Amendment would have entitled creditors to a jury trial had they not tendered claims against the estate."); Billing v. Ravin, Greenberg & Zachin, P.A., 22 F.3d 1242, 1250 (3d Cir. 1994) ("It is clear that a creditor who submits a proof of claim against the bankruptcy estate has no right to a jury trial on issues raised in defense of such a claim."); Travellers Int'l AG v. Robinson, 982 F.2d 96, 98 (3d Cir. 1992) ("Travellers is neither entitled to a jury trial nor is it entitled, in the alternative, to be heard by an Article III judge. Rather, by submitting a proof of claim to the debtor's estate, Travellers effectively waived its right to a jury trial and submitted itself to the equitable jurisdiction of the bankruptcy court."). Similarly, Lucent filed a proof of claim against Winstar's estate and therefore was not constitutionally entitled to a jury trial on the Trustee's related breach of contract claim.[12]

review" is ample basis for us to reject Lucent's argument.

[12] We also note that the fact that Winstar filed its breach of contract claim before Lucent filed its proof of claim does not affect the jury trial analysis. See Travellers Int'l AG, 982 F.2d at 100 n.4 ("To the extent that Travellers attempts to distinguish Langenkamp by arguing that the Supreme Court case refers only to those preference actions in which (as in Langenkamp) a claim is filed

33

We therefore turn to the merits of the Trustee's contract claim.

Shortly after Lucent and Winstar entered into the two original agreements (the First Credit Agreement and the Supply Agreement) Lucent and Winstar entered into a subcontract by which Wireless "agree[d] to perform for Lucent the tasks, responsibilities and services described on the attached task specific schedule(s) (individually a "Task Order")." 348 B.R. at 256. Thus, the Subcontract contemplated that Lucent would provide a Task Order to Wireless before Wireless performed the contemplated services.

However, the Bankruptcy Court found–and the parties do not dispute–that at most one Task Order was issued from Lucent to Wireless, and none after the first quarter of 1999. Nonetheless, despite a contract provision barring modification of the Subcontract unless in writing and signed by the parties, "between January 1999 and October 2000, Lucent paid Wireless approximately $325 million for services performed under the Subcontract, most, if not all, without a prior written task order." Id. at 257. Instead, "the parties quickly dispensed with the task order process, opting instead to exchange less formal documentation," in which Wireless would perform network construction services first and only subsequently would any paperwork be exchanged among the parties. Id.

The Bankruptcy Court credited former Winstar Chief Financial Officer Richard Uhl's explanation for this less formal process. Uhl stated: "Early on it was discovered that Lucent was unable or not capable of defining what should go into the purchase order. So the practice evolved . . . that inasmuch as Lucent could not produce the details of the purchase order, Winstar Wireless would as its subcontractor to Lucent issue an invoice [for services already performed,] which Lucent would then cover with a purchase order and that was the sequence." Id.

---

before the preference action was brought, its position is unsupportable. No court has made such a distinction, nor do we find such a distinction persuasive.").

at 257-58.

As early as June 1999, Lucent became unhappy with this "pass-through" arrangement in that it "could not recognize revenue on the pass-through transaction because it did not have sufficient control over the services being performed by Winstar's [technically Wireless's] employees to allow revenue recognition under the accounting rules." 348 B.R. at 258. Additionally, Lucent was "concerned that financing any additional services [as opposed to equipment] would hamper its ability to sell Winstar's loans," which Lucent attempted to do in 1999 and 2000. Id. Thus, in June 1999, Lucent "informed Winstar that it would not pass through any additional services" even though "Lucent was still unwilling or unable to build the turnkey operation." Id.

However, after high level discussions between the companies' executives, "ultimately Lucent agreed to continue the [pass-through] arrangement." Id. As found by the Bankruptcy Court, Lucent "agreed to finance Wireless-performed services and facilitate the favorable accounting treatment that Winstar desired . . . as an accommodation to Winstar." Id.

In September 2000, Lucent again threatened to refuse to pay for approximately $65 million in services provided by Wireless without the prior issuance of a Task Order. Lucent informed Winstar that "we believe it is not appropriate for Lucent to accept Purchase Orders for these services" in light of the Supply Agreement's target for provision of services by Lucent. 348 B.R. at 259. Lucent called for negotiations to complete a transition agreement that would turn over responsibility for these services from Wireless to Lucent. The Bankruptcy Court, however, found that Lucent "had still not developed the core competencies needed for it to assume the buildout by itself" and therefore Lucent's request for negotiations "was nothing more than an attempt to create a pretext for denying further draws under the Second Credit Agreement so that Lucent could renegotiate the terms of the 'strategic partnership' for its benefit." Id.

Winstar objected to Lucent's refusal to pay and

35

threatened not to complete the Software Pool transaction described above. Lucent then agreed to pay for the contested services, but required Winstar to agree to "lock-up" negotiations regarding a transition agreement. Moreover, Lucent demanded in a letter dated September 27, 2000, that Winstar and Wireless would perform work on the network "only upon prior receipt of a mutually acceptable written purchase order from Lucent (and not at [Winstar's] sole initiative)" or else "Lucent would not be able to accept purchase orders or invoices for any Winstar performed services." 348 B.R. at 262. The Bankruptcy Court credited the testimony of two Winstar executives. The executive who signed and returned the letter testified that, although Winstar assented to Lucent's letter, he "did not understand this letter to terminate the original agreement in the event the parties were unable to enter into a new agreement" and the other testified that he believed that Lucent was demanding the letter "because they needed to book revenue." Id.

In December 2000, Winstar again billed Lucent for services provided by Wireless without a prior Task Order. That is, Winstar sought another "pass-through" transaction by simultaneously requesting to draw approximately $62 million under the Second Credit Agreement and billing Lucent for the Wireless services. Initially, Lucent internally questioned whether payment was appropriate, but concluded that "Winstar can draw down upon the credit facility" and Lucent "really had not the option of denying their rights here." 348 B.R. at 268.

Finally, in March 2001, Winstar again simultaneously requested to draw approximately $62 million under the Second Credit Agreement and billed Lucent for services provided by Wireless in the preceding quarter. Lucent refused to pay because no Task Order authorized the work, and the Trustee seeks damages of approximately $62 million for this alleged breach of contract.

Lucent contends it had no obligation to pay the amount requested because no Task Order had been submitted, as required by the Subcontract. The Bankruptcy Court held that the course of conduct between Lucent, Winstar, and Wireless

36

amounted to a modification of the Subcontract. The parties agree that New York state law controls the Trustee's claim for breach of the Subcontract. The question of whether a contract has been modified is one of fact and therefore subject to review only for clear error.[13] See Carnes Co. v. Stone Creek Mech., Inc., 412 F.3d 845, 852 (7th Cir. 2005) ("Whether a contract has been modified is a question of fact subject to the clearly erroneous standard of review.").

"Fundamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms." Beacon Terminal Corp. v. Chemprene, Inc., 429 N.Y.S.2d 715, 718 (N.Y. App. Div. 1980). Where, as here, the alleged modification arises from the parties' course of performance, the "conduct of a party may manifest assent if the party intends to engage in such conduct and knows that such conduct gives rise to an inference of assent. Thus, a promise may be implied when a court may justifiably infer that the promise would have been explicitly made, had attention been drawn to it." Maas v. Cornell Univ., 721 N.E.2d 966, 970 (N.Y. 1999) (citations omitted).

Lucent argues that the Bankruptcy Court's findings were insufficient to demonstrate that Lucent assented to modification of the Subcontract. According to Lucent, "the fact that Lucent decided to perform in a given quarter without insisting on Task Orders by no means demonstrates that it agreed to the permanent removal of that condition as to all future quarters." Appellant's Br. at 65-66 (emphasis in original). Lucent also notes that the Subcontract provided that the "waiver of [a] . . . breach shall

_____

[13] We note that if the Bankruptcy Court had jurisdiction over this matter only as a "related to" proceeding, "we [must] treat the district court as the trial court, accepting its findings of fact unless clearly erroneous." Copelin v. Spirco, Inc., 182 F.3d 174, 180 (3d Cir. 1999). Here, the District Court adopted the Bankruptcy Court's findings regarding the Trustee's breach of contract claim, and our review, therefore, is for clear error.

[not] constitute a waiver . . . with respect to any subsequent other . . . breach." App. at 1558. In sum, Lucent contends that the Trustee failed to satisfy its burden to prove that Lucent assented to any modification of the Subcontract. Instead, Lucent contends that it simply unilaterally waived the Task Order requirement on a quarter by quarter basis. See Nassau Trust Co. v. Montrose Concrete Prods. Corp., 436 N.E.2d 1265, 1269 (N.Y. 1982) (noting the distinction "between an oral agreement that purports to modify the terms of a prior written agreement and an oral waiver by one party to a written agreement of a right to require of the other party certain performance in compliance with that agreement"). Moreover, Lucent argues that it validly withdrew that waiver by letter dated September 27, 2000, which provided that "Winstar would perform . . . work only upon prior receipt of a mutually acceptable written purchase order from Lucent (and not at its sole initiative)." App. at 952.

The record evidence is inconsistent with Lucent's waiver argument. The Bankruptcy Court noted that, "beginning as early as the communications surrounding the invoice for the second quarter of 1999 [i.e. the second quarter of dealings under the Subcontract], Lucent warned Winstar that it would pay for Wireless' services 'one last time' without a task order," but the Bankruptcy Court concluded that "there were too many 'one last times' for that warning to be effective." 348 B.R. at 269. Moreover, Lucent's September 27, 2000, letter sought Winstar's assent to, inter alia, a requirement that Lucent would not pay for Wireless services without a prior task or purchase order from Lucent. If Lucent had simply waived the Task Order requirement to that point, Winstar's assent to the letter would have been unnecessary.

Finally, Lucent provided funds under a December 28, 2000, draw request under the Second Credit Agreement to which Winstar attached an invoice for Wireless services already rendered in the quarter ending December 31, 2000–the very same structure as the March 2001 transaction that Lucent refused to pay and that gave rise to this claim. In sum, we agree with the Bankruptcy Court's conclusion that "it is not credible that almost two years after the pattern had been established that Lucent

38

would insist upon compliance with the letter of the Subcontract, particularly when Lucent [had] used this tactic in the past to try to pressure Winstar." Id. at 270.

In addition to its contention that it did not breach the Subcontract in March 2001 because no Task Order authorized the services for which Wireless was attempting to collect, Lucent contends that any purported modification created by the parties' course of conduct was ineffective because the Subcontract required any modification to be in writing.[14] Once again, we agree with the Bankruptcy Court's rejection of Lucent's contention that the modification of the Subcontract's requirement of a preceding Task Order was ineffective in light of the Subcontract's provision barring non-written modifications. New York law provides that any contract may be modified by a course of performance, even if that contract otherwise requires modifications to be in writing. See Rosen Trust v. Rosen, 386 N.Y.S.2d 491, 499 (N.Y. App. Div. 1976) ("[A]ny written agreement, even one which provides that it cannot be modified except by a writing signed by the parties, can be effectively modified by a course of actual performance."). Lucent contends that the non-written modification can only be effective if one of the exceptions to N.Y. Gen. Oblig. Law § 15-301 enunciated in Rose v. Spa Realty Asscs. is satisfied. See 366 N.E.2d 1279, 1281 (N.Y. 1977) ("Partial performance of an oral agreement to modify a written contract, if unequivocally referable to the modification, avoids the statutory requirement of a writing. Moreover, when a party's conduct induces another's significant and substantial reliance on the agreement to modify, albeit oral, that party may be estopped from disputing the modification notwithstanding the statute."). Assuming that Rose applies to modifications based on the parties' course of

---

[14] Lucent relies on a New York statute that provides, "[a] written agreement . . . which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent." N.Y. Gen. Oblig. Law § 15-301(1).

performance, we believe that the parties' performance under the Subcontract was unequivocally referable to the modification at issue. Wireless' performance of Subcontract services without a prior Task Order, and Lucent's payment thereof, were incompatible with the express terms of the Subcontract. Moreover, we agree with the Bankruptcy Court that "[b]ased upon Lucent's past practices, neither Wireless nor Winstar was unreasonable in relying upon Lucent's practice of funding and paying for services upon presentation of an invoice . . . and neither was unreasonable in expecting this practice to continue." 348 B.R. at 270.

We conclude, as did the Bankruptcy Court, that the Subcontract was indeed modified by the parties' course of performance. The record shows that only one Task Order was ever issued by Lucent and that the parties thereafter dispensed with the Task Order requirement for nearly two years, during which time Lucent paid Wireless approximately $325 million for services under the Subcontract. Winstar's then-President and Chief Operating Officer testified that he understood that the Task Order requirement had been replaced by an exchange of invoices and purchase orders after Wireless performed work. Winstar's then-Chief Financial Officer also testified that this more informal exchange of documents after Wireless completed work under the Subcontract was necessary because "[e]arly on it was discovered that Lucent was unable or not capable of defining what should go into the purchase order." 348 B.R. at 257. Similarly, a Lucent executive testified that "we clearly were in a relationship that was commercially binding because there were purchase orders and invoices between the companies where we subcontracted with them."[15] Id. at 269. Together, this

---

[15] The Bankruptcy Court also cited internal Lucent documents that it interpreted as implying that Lucent executives believed that Lucent was obligated to pay for Wireless services under the Subcontract without a prior Task Order. However, Lucent convincingly argues that these documents refer not to Wireless' right to payment under the Subcontract, but rather to Winstar's right to borrow funds under the Second Credit

evidence demonstrates that the Subcontract was modified by the parties' course of performance such that no Task Order was required prior to Wireless' provision of services under the Subcontract.

In sum, we hold that the Subcontract was modified in light of the parties' course of performance such that the parties dispensed with the Task Order requirement in favor of an informal exchange of documents after Wireless performed services. Moreover, we conclude that this modification was effective under New York law. Thus, we agree with the lower courts that Lucent breached the Subcontract when it refused to pay Wireless' March 2001 invoice for services rendered under the Subcontract.

C.      Equitable Subordination

Finally, we reach the Bankruptcy Court's decision, on the Trustee's request, to equitably subordinate Lucent's claims. The Bankruptcy Code provides that a "court may (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate." 11 U.S.C. § 510(c). Section 510(c) simply "codified" existing judge-made doctrine, and development of the substantive standards for equitable subordination has been left to the courts. This court has described equitable subordination as a "remedial rather than penal" doctrine designed "to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." Citicorp Venture Capital, Ltd.v. Comm. of Creditors Holding Unsecured Claims, 323 F.3d 228, 233-34 (3d Cir. 2003) (Citicorp II).

---

Agreement. The Trustee does not allege that Lucent breached the Second Credit Agreement.

As outlined in the influential case of Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692, 699-700 (5th Cir. 1977), "three conditions must be satisfied before exercise of the power of equitable subordination is appropriate:" (1) "[t]he claimant must have engaged in some type of inequitable conduct;" (2) "[t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant;" and (3) "[e]quitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code]." See also United States v. Noland, 517 U.S. 535, 538-39 (1996) (favorably citing the In re Mobile Steel analysis); Citicorp II, 323 F.3d at 233-34 (same). We have previously stated that a Bankruptcy Court's findings as to the amount of a creditor's claims that should be subordinated under the principles of equitable subordination are subject to review only for clear error. Citicorp II, 323 F.3d at 235.

Lucent argues that the Bankruptcy Court erred under all three of these factors when it subordinated Lucent's unsecured claims against the Winstar estate to the claims of all of Winstar's creditors, as well as certain equity interest holders, and transferred Lucent's secured claim to the Trustee.

Lucent's claim against the Winstar estate had two parts: (1) an unsecured claim and (2) a secured claim stipulated to be worth approximately $21 million. Appellant's Reply Br. at 43. The Bankruptcy Court essentially subordinated the first part to Winstar's other creditors and transferred the second part to the Trustee. The Trustee's counsel advised us at oral argument that Lucent is unlikely in any case to recover on any of its unsecured claims against Winstar's estate. Thus, the parties' battle is primarily over the $21 million in stipulated secured claims.

First, Lucent argues that the Bankruptcy Court did not make sufficient findings of inequitable conduct. The inequitable conduct underlying equitable subordination may be "unrelated to the acquisition or assertion of the particular claim whose status [is] at issue." In re Mobile Steel, 563 F.2d at 701. "A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." In re Fabricators, Inc., 926

42

F.2d at 1465. Thus, "the trustee bears the burden of presenting material evidence of unfair conduct . . . [that] the [insider] claimant then must [rebut by proving] the fairness of his transactions with the debtor." Estes v. N & D Props., Inc. (In re N & D Properties, Inc.), 799 F.2d 726, 731 (11th Cir. 1986). On the other hand, "[i]f the claimant is not an insider, then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary." In re Fabricators, Inc., 926 F.2d at 1465.

As we noted earlier in the discussion of Lucent's insider status, the Bankruptcy Court viewed Lucent's conduct to be "egregious." 348 B.R. at 284. We have already rejected Lucent's contention that it was "merely . . . exercising its bargained-for contractual rights under the Subcontract and the Second Credit Agreement" and that it therefore did not engage in any inequitable conduct. Appellant's Br. at 81. The Bankruptcy Court's findings on equitable subordination constitute "material evidence of unfair conduct," In re N & D Props., Inc., 799 F.2d at 731, such that the Trustee has met her burden on the first Mobile Steel factor. The Bankruptcy Court found that Lucent used threats of non-payment under the Subcontract in order to force Winstar to purchase unneeded equipment from Lucent–all financed under the Second Credit Agreement, thereby triggering Lucent's ability to issue the refinancing notice because these equipment transactions pushed Winstar over the borrowing threshold for that notice. The Bankruptcy Court also found that Lucent deliberately delayed issuing such a refinancing notice ("a financial death knell") under the Second Credit Agreement until after Winstar closed on the Siemens loan (which, of course, Winstar was obligated to pay to Lucent) as well as a private equity deal for $270 million. Although Lucent had the right to issue the refinancing notice "at its sole discretion" after a triggering event, App. at 1663, Lucent essentially delayed the refinancing notice to prevent public disclosure of Winstar's poor financial health and thereby induce other creditors to provide funds to Winstar. Cf. Citicorp II, 323 F.3d at 235 ("Although the pursuit of one's legal rights may not be grounds for equitable subordination, protracted and unjustified litigation tactics that harm the estate by causing it to incur fees may justify

43

subordination.").  See also Collier on Bankruptcy at § 510.05 (stating that, in cases finding equitable subordination appropriate, many courts look to whether "the claimant's conduct may have been the direct or indirect cause for the other [creditors] having changed their positions").  In sum, we cannot conclude that the Bankruptcy Court's finding of inequitable conduct was clearly erroneous.

Turning to the factor of harm to creditors, "[A] claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct."  In re Mobile Steel, 563 F.2d at 701.  However, this court has stated that

> quantification [of harm] may not always be feasible and, where that is the case, it should not redound to the benefit of the wrongdoer.  A bankruptcy court should . . . attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination.

Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims, 160 F.3d 982, 991 (3d Cir. 1998) (Citicorp I).

The Bankruptcy Court found that "Lucent's conduct resulted in substantial damages to Winstar and ultimately Winstar's creditors," including (1) interest paid to Lucent for financing Winstar's purchases of unneeded equipment, (2) storage costs and insurance associated with these purchases, (3) Winstar's purchase of approximately $244 million in Lucent equipment eventually sold for pennies on the dollar and (4) Lucent's intentional withholding of the refinancing notice to induce the Siemens loan and $270 million in private equity financing.  348 B.R. at 284.  Based on these findings, the Bankruptcy Court subordinated Lucent's claim "to the claims of all creditors, including all unsecured claims . . . and to the interests of those entities who infused the $270 million of equity

44

in Winstar on December 7, 2000." Id. at 285 (emphasis removed). Moreover, Lucent's secured claim was "preserved for the benefit of the estate and . . . transferred to the Trustee." Id.

Lucent contends that the Bankruptcy Court erred because "[n]one of these purported 'damages' constitutes the kind of harm to the estate or to other creditors that could justify equitable subordination." Appellant's Br. at 82. Further, Lucent notes that the Bankruptcy Court made no finding as to the extent of the injury arising from the interest, storage, and insurance payments. Appellant's Br. at 83. Finally, Lucent contends that the Bankruptcy Court erred because it "made no attempt to tailor its remedy" to the alleged harm. Appellant's Br. at 83.

Lucent's argument that the Bankruptcy Court failed to identify harm to the estate or creditors of a type that could justify equitable subordination is largely a repackaging of its argument that it did not engage in inequitable conduct. Moreover, although this court has indicated that a creditor's claim should only be subordinated to the extent necessary to remedy the harm caused by that creditor's misconduct, we have never required the bankruptcy estate to quantify specific harms to the estate or other creditors. Indeed, the key question on appellate review is whether the bankruptcy court's findings demonstrate the "proportionality of the remedy to the injury." Citicorp I, 160 F.3d at 991.

Here, the Bankruptcy Court's findings demonstrated concrete harm to Winstar and its creditors and equity holders. For example, the Bankruptcy Court found that Lucent's inequitable conduct caused substantial damages to Winstar arising out of the purchase of unneeded equipment. Similarly, the Bankruptcy Court found that Lucent harmed other Winstar creditors and equity holders, perhaps most especially Siemens and the private equity investors who provided Winstar with hundreds of millions of dollars in December 2000, because Lucent purposefully delayed issuing its refinancing notice in order to induce those investments. Finally, the magnitude of these injuries (e.g. approximately $240 million in unnecessary purchases plus associated interest, storage and insurance costs;

the $200 million Siemens loan; and $270 million in private equity investments) is in at least a rough proportionality with the value of Lucent's claims against Winstar's estate (roughly $900 million).  In sum, we cannot conclude that the Bankruptcy Court clearly erred in finding that Lucent's inequitable conduct harmed Winstar's estate and its creditors.

Finally, Lucent contends that the Bankruptcy Court's equitable subordination holding was inconsistent with the Bankruptcy Code because § 510(c) does not permit the subordination of debt to equity.  We agree.  Section 510(c) provides that a court may equitably subordinate "all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."  (emphasis added).  The Bankruptcy Code distinguishes between a "proof of claim," which may be filed by a "creditor," and a "proof of interest," which may be filed by an "equity security holder." 11 U.S.C. § 501(a).  See generally In re Insilco Techs., Inc., 480 F.3d 212, 217-18 (3d Cir. 2007) (noting that, under the Bankruptcy Code, "the distinction between creditors (who hold 'claims' against the estate) and equity investors (who hold 'interests' in the estate) is important, for holders of claims receive much more favorable treatment than holders of interests. Equity investment brings not a right to payment, but a share of ownership in the debtor's assets-a share that is subject to all of the debtor's payment obligations.").  Thus, we read § 510(c) to clearly incorporate the distinction between claims and interests such that creditors' claims may not be equitably subordinated to equity interests.  See Collier on Bankruptcy at § 510.05 ("Under subsection (c)(1), claims may be subordinated to claims, and interests may be subordinated to interests, but claims may not be subordinated to interests.").

Although the Bankruptcy Court did not directly address this point, the District Court (and the Trustee on appeal) relied on In re Lifschultz Fast Freight, 132 F.3d 339, 342 (7th Cir. 1997) for the proposition that the "power of equitable subordination . . . allows a bankruptcy court to relegate even a secured claim to a lower tier, even to the lowest--the equity tier." That statement was dicta; in fact, the power of a bankruptcy

46

court to subordinate debt (claims) to equity (interests) was not at issue in In re Lifschultz.

In sum, § 510(c)'s language plainly provides that a creditor's claim can be subordinated only to the claims of other creditors, not equity interests. Thus, we will modify the Bankruptcy Court's equitable subordination order such that Lucent's claims are subordinated only to the claims of other creditors.

## IV.

## Conclusion

For the above-stated reasons, we agree with the judgment of the Bankruptcy Court with respect to the Trustee's preference and breach of contract claims, but will modify the judgment with respect to equitable subordination such that Lucent's claims are subordinated only to Winstar's other creditors and not any equity interests.