**PRECEDENTIAL**

**UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

_____

No. 13-1712
_____

IN RE: FRIEDMAN'S INC.,

Debtor

FRIEDMAN'S LIQUIDATING TRUST,

Appellant

v..

ROTH STAFFING COMPANIES LP

_____

Appeal from the United States District Court
for the District of Delaware
(District Court No. 1-12-cv-00306)
District Judge:  Honorable Richard G. Andrews

_____

Argued October 17, 2013

Before:  RENDELL, JORDAN and LIPEZ*, <u>Circuit Judges</u>


(Opinion Filed: December 24, 2013)


John D. Demmy, Esquire  **(Argued)**
Maria Aprile Sawczuk, Esquire
1105 North Market Street
Suite 700
Wilmington, DE   19801

Nicholas F. Kajon, Esquire
Stevens & Lee, P.C.
485 Madison Avenue
20th Floor
New York, NY   10022

Counsel for Appellant

---

*Honorable Kermit V. Lipez, Senior United States Circuit Judge for the Court of Appeals for the First Circuit, sitting by designation.

Peter M. Sweeney, Esquire

Blakeley & Blakeley, LLP
1000 North West Street
Suite 1200
Wilmington, DE   19801

Johnny White, Esquire
Bradley D. Blakeley, Esquire  **(Argued)**
Blakeley & Blakeley, LLP
2 Park Plaza
Suite 400
Irvine, CA   92614


Counsel for Appellee

----

O P I N I O N

----

**RENDELL**, <u>Circuit Judge</u>:

This appeal presents an issue of first impression in our Court: can a post-petition payment to a creditor pursuant to a Wage Order entered at a debtor's request reduce the creditor's new value defense—and thereby increase preference liability—the same as it would if the payment had been made pre-petition?

Under the Bankruptcy Code, the trustee may avoid certain preferential transfers made by a debtor to a creditor in

3

the 90 days before its bankruptcy petition was filed. *See* 11 U.S.C. § 547(b) (2006). A creditor who gives the debtor new value subsequent to a preference payment, however, may use what is referred to as the "new value" defense to offset an otherwise avoidable preference. *See id.* § 547(c)(4). The new value defense is not applicable to the extent that, thereafter, the debtor makes "an otherwise unavoidable transfer" to the creditor on account of the value received. *Id.* § 547(c)(4)(b). We hold that where "an otherwise unavoidable transfer" is made after the filing of a bankruptcy petition, it does not affect the new value defense. For this reason, we will affirm the order of the District Court affirming the Bankruptcy Court.

## I. Background

The facts giving rise to this appeal are undisputed. Friedman's, Inc. ("the Debtor") filed for bankruptcy under Chapter 7 of the Bankruptcy Code on January 22, 2008, and thereafter the case was converted to one under Chapter 11 of the Bankruptcy Code. In the 90 days prior to filing for bankruptcy ("the preference period"), the Debtor made payments for personnel to Roth Staffing ("Appellee") totaling $81,997.57. After these preferential transfers, but before the petition was filed, Roth Staffing provided services valued at $100,660.88 to the Debtor. The money owed for these services remained unpaid as of the date the bankruptcy petition was filed.

On January 25, 2008, the Debtor filed a motion in Bankruptcy Court seeking authority to pay its employees and independent contractors (collectively, "Employees"), pre-petition wages, compensation, and related benefits. It stated

4

that as of the petition date, it had approximately 3,500 Employees and outstanding obligations to them in the amount of approximately $4 million. The Debtor represented to the Court, *inter alia*, that if its Employees were not compensated at least in part for the services that had been provided, there would likely be "an epidemic of Employee departures" and/or a "deterioration in morale." Mot. of Debtors and Debtors in Possession for an Order Authorizing the Debtors To Pay Prepetition Wages, Compensation, and Employee Benefits Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code ¶¶ 39-40, In re: Friedman's Inc., No. 08-10161 (Bankr. D. Del. Jan. 25, 2008). It argued that this would "substantially and adversely impact [its] businesses and result in immediate and irreparable harm to the creditors and estates." *Id.* ¶ 40.

The Debtor asked the Court to invoke its power under § 105(a) of the Bankruptcy Code to enable the Trustee to make the payments to Employees pursuant to § 363(b)(1). Section 105(a) states, in relevant part: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b)(1) provides that a "trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." *Id.* § 363(b)(1).

The Court granted the Debtor's motion ("the Wage Order"). Pursuant to the Wage Order, and after filing its bankruptcy petition, the Debtor paid $72,412.71 to Roth Staffing on account of pre-petition staffing services.

On March 5, 2009, Friedman's Liquidating Trust ("FLT" or "Appellant"), the successor in interest to the

5

Debtor, commenced this action in Bankruptcy Court, seeking to avoid and recover transfers made to Roth Staffing as preferences, pursuant to § 547(b) of the Bankruptcy Code. This section states:

> Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
>> (A) on or within 90 days before the date of the filing of the petition; or
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>> (A) the case were a case under chapter 7 of this title;
>> (B) the transfer had not been made; and
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

In its answer to FLT's complaint, Roth Staffing asserted the affirmative defense of new value, pursuant to § 547(c)(4) of the Code, which reads:

> The trustee may not avoid under this section a transfer—
>
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> > (A) not secured by an otherwise unavoidable security interest; and
> > (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor. . .

*Id.* § 547(c)(4). Roth Staffing claimed that because it had provided subsequent new value to the Debtor in an amount ($100,660.88) exceeding the preferential transfers made ($81,997.57), FLT could not avoid these transfers.

FLT responded by arguing that Roth Staffing's new value defense had to be reduced by the post-petition payment of $72,412.71 that the Debtor had made pursuant to the Wage Order. FLT argued that this "otherwise unavoidable transfer" reduced Roth Staffing's new value defense to $28,248.17, and therefore entitled FLT to recover $53,749.40 ($81,997.57 - $28,248.17) on its preference claim.

7

The Bankruptcy Court held that because FLT's payments made pursuant to the Wage Order occurred after the bankruptcy petition was filed, these payments could not enter into the preference calculation. Because the Bankruptcy Code does not set forth a cutoff for when an "otherwise unavoidable transfer" should be considered in computing "new value," the Court looked to caselaw. The Court concluded that the cutoff should be the petition date, relying on language from our opinion in *In re New York City Shoes, Inc.*, describing the three requirements for establishing a new value defense as follows:

> First, the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b). Second, after receiving the preferential transfer, the preferred creditor must advance "new value" to the debtor on an unsecured basis. Third, the debtor must not have fully compensated the creditor for the "new value" *as of the date that it filed its bankruptcy petition*.

880 F.2d 679, 680 (3d Cir. 1989) [hereinafter *New York City Shoes*] (emphasis added). The Bankruptcy Court found our opinion in *New York City Shoes* to be controlling, and, therefore, held that since the otherwise unavoidable transfer was made after the petition date, FLT was not entitled to recover on its preference claim. The District Court affirmed the Bankruptcy Court's order denying summary judgment for FLT, but stated that it found our language in *New York City Shoes* regarding the bankruptcy petition date to be dicta. Nevertheless, the District Court explained that it would follow *New York City Shoes* because we described the new

8

value defense test outlined in that case as a holding in a subsequent opinion, *In re Winstar Communications, Inc.*, 554 F.3d 382, 402 (3d Cir. 2009) [hereinafter *Winstar Communications*] ("This court has *held* that § 547(c)(4) imposes three requirements . . . (3) 'the debtor must not have fully compensated the creditor for the 'new value' as of the date that it filed its bankruptcy petition.'") (emphasis added). The Court reasoned that while the language from *Winstar Communications* could also be construed to be dicta, it was reluctant to find that what we said twice, and once referred to as a "holding," was dicta.

FLT now appeals the District Court's decision. It argues that the Bankruptcy Court (and by extension, the District Court) erred in: (1) relying on dicta from *New York City Shoes* rather than the "plain language" of § 547(c)(4) of the Bankruptcy Code; (2) allowing Roth Staffing to "double dip"—contrary to policies underlying bankruptcy law—by asserting a new value defense even though it did not replenish the Debtor's estate; and (3) failing to follow our holding in *In re Kiwi International Air, Inc.*, 344 F.3d 311 (3d Cir. 2003) [hereinafter *Kiwi Air*], which, it urges, requires us to account for material events occurring after the commencement of a bankruptcy case in performing the preference analysis.

## II. Standard of Review

Our standard of review of a District Court's review of a Bankruptcy Court's decision is plenary. *Winstar Commc'ns*, 554 F.3d at 389 n.3. We "exercise the same standard of review as the District Court in reviewing the Bankruptcy Court's determinations." *Id*. We review the Bankruptcy Court's "legal determinations *de novo*, its factual findings for

9

clear error, and its exercises of discretion for abuse thereof." *In re Goody's Family Clothing, Inc.*, 610 F.3d 812, 816 (3d Cir. 2010).

**III. Discussion**

As a threshold matter, we must determine whether we are bound by prior Third Circuit precedent on the question presented here. If a determination by our Court is not necessary to our ultimate holding, "it properly is classified as *dictum.*" *Calhoun v. Yamaha Motor Corp., U.S.A.*, 216 F.3d 338, 343 n.9 (3d Cir. 2000). It is well established that "we are not bound by our Court's prior *dicta.*" *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 274 (3d Cir. 2007). The District Court correctly noted that on both occasions when we previously addressed this question, our statement of the law may well have been dicta, and not a holding, because neither *New York City Shoes* nor *Winstar Communications* involved a post-petition payment on new value. Therefore neither we, nor the Bankruptcy Court nor District Court, would be bound by these opinions. We examine these opinions more closely below.

**A. *New York City Shoes* and *Winstar Communications***

In *New York City Shoes*, we were faced with the question of "when a postdated check given by a debtor to a creditor should be deemed transferred for purposes of section 547(c)(4)." 880 F.2d at 679. The answer to this question bore on whether new value had been given before or after a preferential transfer, and therefore whether the new value defense was applicable. None of the relevant transactions or dates in the case occurred post-petition. Therefore, when we

10

announced the test for a defense under § 547(c)(4), and stated that the third requirement was that "the debtor must not have fully compensated the creditor for the 'new value' as of the date that it filed its bankruptcy petition," *id.* at 680, the extra-statutory language we included regarding the petition date was not germane to our analysis. This language was dicta, and consequently not binding upon future courts.

Nevertheless, in *Winstar Communications*, we referred to the three-part test announced in *New York City Shoes* as a holding. 554 F.3d at 402. Reference to the third requirement was again, however, immaterial to our disposition of the case. In *Winstar Communications*, the primary questions with respect to the new value defense were whether new value had been extended *after* the preferential transfer, and whether new value had been extended on an *unsecured* basis. *Id.* We quoted *New York City Shoes* for the principle that new value must be extended after a preferential transfer on an unsecured basis. *See id.* at 402. Because none of the relevant transactions occurred post-petition, our statement regarding the petition date was not pertinent to our analysis. The statement was, again, dicta and we are not bound by it here.[1]

---

[1] We are mindful that numerous courts have adopted and followed this dicta as if it were a holding. *See, e.g.*, *In re Braniff, Inc.*, 154 B.R. 773, 784 (Bankr. M.D. FL. 1993) (referring to dicta from *New York City Shoes* as majority rule); *In re Energy Coop., Inc.*, 130 B.R. 781, 789 (N.D. Ill. 1991) (citing *New York City Shoes* in holding that post-petition transactions between creditor and debtor do not limit new value defense).

Having established that no prior opinion binds us on the question presented, we turn to FLT's other arguments. FLT contends that we need look no further than the text of the Bankruptcy Code in determining whether or not to consider post-petition payments. We agree; however, in doing so, we reach a different conclusion from the one Appellant urges regarding the plain meaning of the statute.

**B. The Plain Language of § 547(c)(4)(B)**

When statutory "language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000); *see also Parker v. NutriSystem, Inc.*, 620 F.3d 274, 277 (3d Cir. 2010) ("Where the statutory language is unambiguous, the court should not consider statutory purpose or legislative history."). Here, § 547(c)(4)(B) is silent as to when a payment must be made by a debtor to defeat a creditor's new value defense. Must it have been made before the petition date? Do other provisions of the Bankruptcy Code inform this issue? District and bankruptcy courts are nearly equally divided on this issue.[2]

---

[2] Some of these cases involved post-petition payments made pursuant to a Critical Vendor Order. The Wage Order in the instant case was filed pursuant to §§ 105(a) and 363(b) of the Bankruptcy Code, provisions often invoked in Critical Vendor Orders. Given the similarity of the Wage Order to a Critical Vendor Order, the issue presented in these cases is analogous.

*Compare In re Phoenix Rest. Grp., Inc.*, 373 B.R. 541, 547 (M.D. Tenn. 2007) (holding that post-petition payments made pursuant to Critical Vendor Order could not be used to offset pre-petition new value); *In re Schabel*, 338 B.R. 376, 381 (Bankr. E.D. Wis. 2005) (holding that new value must remain unpaid at time of filing of bankruptcy petition); *In re Thurman Constr., Inc.*, 189 B.R. 1004, 1014 (Bankr. M.D. Fl. 1995) (finding that new value must remain unpaid as of petition date, rather than date court adjudicates preference action); *In re Braniff, Inc.*, 154 B.R. 773, 784-85 (Bankr. M.D. Fl. 1993) (following "majority rule" articulated in *New York City Shoes* that new value remain unpaid as of petition date); *and In re Energy Coop., Inc.*, 130 B.R. 781, 789 (N.D. Ill. 1991) (citing *New York City Shoes* for principle that post-bankruptcy payments by debtor do not limit new value

Also analogous are cases in which post-petition payments were made pursuant to § 503(b)(9), which allows for administrative expense priority for the value of goods received by a debtor 20 days before filing for bankruptcy. Courts are similarly divided on whether goods given priority later pursuant to § 503(b)(9) can constitute new value. *Compare In re Commissary Operations, Inc.*, 421 B.R. 873, 878 (Bankr. M.D. Tenn. 2010) (holding that deliveries entitled to a § 503(b)(9) claim are not disqualified from constituting new value), *with In re T.I. Acquisition, LLC*, 429 B.R. 377 (Bankr. N.D. Ga. 2010) (holding that new value defense does not apply where creditor has been paid for goods pursuant to § 503(b)(9)), *and In re Circuit City Stores, Inc.*, No. 10-3068, 2010 WL 4956022 (Bankr. E.D. Va. Dec. 1, 2010) (applying analysis from *T.I. Acquisition* in concluding that same materials cannot be the basis for both a new value defense and § 503(b)(9) claim).

13

defense); *with In re Furr's Supermarkets, Inc.*, 485 B.R. 672, 733-34 (D.N.M. 2012) [hereinafter *Furr's Supermarkets*] (holding that cutting off preference calculation at petition date "makes no economic sense"); *In re Login Bros. Book Co.*, 294 B.R. 297, 300 (N.D. Ill. 2003) [hereinafter *Login Bros.*] ("[B]oth the plain language and policy behind the statute indicate that the timing of a repayment of new value is irrelevant."); *In re MMR Holding Corp.*, 203 B.R. 605, 609 (Bankr. M.D. La. 1996) ("An unavoidable post-petition transfer on account of new value extended subsequent to a preference *should* limit the use of § 547(c)(4) by the amount of the unavoidable transfer, as without a reduction in the new value offset, the transferee would be receiving double use of the new value. . ..."); *and In re D.J. Mgmt. Grp.*, 161 B.R. 5, 8 (Bankr. W.D.N.Y. 1993) (holding that post-petition payments on new value must be considered under § 547(c)(4)).

The fact that courts are divided in their interpretations of § 547(c)(4)(B) does not mean, however, that the provision is necessarily ambiguous. *See In re Price*, 370 F.3d 362, 369 (3d Cir. 2004) ("[J]ust because a particular provision may be, by itself, susceptible to differing constructions does not mean that the provision is therefore ambiguous."). A provision is ambiguous, "when, despite a studied examination of the statutory context, the natural reading of a provision remains elusive." *Id*. We have previously noted that "in interpreting the Bankruptcy Code, the Supreme Court has been reluctant to declare its provisions ambiguous, preferring instead to take a broader, contextual view, and urging courts to 'not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'" *Id.* at 369 (quoting *Kelly v. Robinson*, 479 U.S. 36, 43 (1986)). Context is therefore key in determining the

meaning of a particular provision and whether or not it is ambiguous. *See Official Comm. of Unsecured Creditors of Cybergenics Corp., ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 559 (3d Cir. 2003) (*en banc*) ("As the Supreme Court has often noted, '[s]tatutory construction [ ] is a holistic endeavor,' and this is especially true of the Bankruptcy Code.") (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)); *see also Alli v. Decker*, 650 F.3d 1007, 1012 (3d Cir. 2011) (holding that courts may look to statutory context in making threshold ambiguity determination). If, after close examination of the statutory context and underlying policy goals, the plain meaning of a provision is still unclear, we then turn to pre-Code practice and legislative history to find meaning. *See In re Price*, 370 F.3d at 369. These tools of construction, however, are tools of last resort. *Id.*

Appellant argues that the statute plainly indicates that a debtor's payment offsetting new value may occur at any time, either pre- or post-petition, as long as it is a transfer made after the new value is extended. Appellant bases this interpretation on the Code's silence, in that it lacks any specific language containing a temporal limitation. Because the drafters could have set forth a cutoff date, but did not, Appellant urges there is no limit. This reading has some appeal, but does not take into account the context in which the provision is found. If we read the statute in this manner, the time period involved would be totally open-ended such that any payment, at any time, could defeat a new value defense. Did Congress really intend there to be no limit to when a payment defeating a new value defense could be made in determining whether a preference has occurred? We think not.

15

However, we rest this conclusion primarily on the context and policy of the Code, rather than specific language, as we discuss below. We, therefore, do not rely on two arguments Appellee makes hinging on single words and phrases in § 547(c)(4). For example, Appellee contends that the word "transfer" as used in § 547(c)(4) refers back to § 547(b), which states that in order for a transfer to be avoidable, it must have occurred within the 90 days preceding the petition date.[3] Appellee urges that the later use of "transfer" must mean that the later word is also modified by the 90-day phrase. While in two instances in § 547(c)(4) "transfer" is clearly modified in a way referring back to the 90-day period, in the last instance, referring to the "otherwise unavoidable transfer" issue here, it is not. The mere addition of the word "unavoidable" does not give us any reason to think that such a temporal limitation should apply. Thus, this argument is without merit.

---

[3]     Section § 547(b)(4) provides :

[T]he trustee may avoid any transfer of an interest of the debtor in property—
    (4) made—
        (A) on or within 90 days before the date of the filing of the petition; or
        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider. . .

11 U.S.C. § 547(b)(4).

Appellee rests on similarly shaky ground where it argues that the use of the word "debtor" rather than "estate" or "debtor-in-possession" might indicate that the provision only refers to pre-petition activity. Several other courts have found this argument persuasive,[4] but it does not withstand scrutiny. Not only does the Bankruptcy Code fail to define a "debtor" as a pre-petition, as opposed to post-petition, entity, *see* 11 U.S.C. § 101(13), but also many other provisions in the Code refer to "debtors" in the post-petition context. *See, e.g.*, *id.* § 329 (referring to attorneys representing "a debtor" in a case under the title); and § 521 (describing a debtor's

---

[4] *See, e.g.*, *In re Phoenix Rest. Grp., Inc.*, 317 B.R. 491, 497 (Bankr. M.D. Tenn. 2004) ("Throughout § 547, "the debtor" refers to the *prepetition* entity . . .. Had Congress intended § 547(c)(4)(B) to account for payments made post petition, the section would have included something like 'an otherwise unavoidable transfer of an interest of the estate in property to or for the benefit of such creditor.'"); *In re Sharoff Food Serv., Inc.*, 179 B.R. 669, 678 (Bankr. D.Co. 1995) (citing *In re Bellanca Aircraft Corp.*, 850 F.2d at 1284) (stating that "the specific language 'to or for the benefit of the debtor' [implies] that the subsequent advances of new value are only those given prepetition, because any post-petition advances are given to the debtor's estate, not the debtor"); *In re D.J. Mgmt. Grp.*, 161 B.R. 5, 6 (Bankr. W.D.N.Y. 1993) ("The phrase 'the debtor' is systematically used throughout the Bankruptcy Code to connote an entity different from 'the estate,' 'the Trustee,' or 'the debtor-in-possession.' If Congress had intended to recognize a 'new value' exception for credit extended to the 'estate' or to the 'trustee,' it would not have used the word 'debtor.'").

post-petition duties). We must conclude that Appellee's argument, therefore, is not persuasive on this issue.

Rather than focusing, as the parties do, on the presence or absence of individual words and phrases within § 547(c)(4)(B), we take a broader approach to our analysis, examining the provision in the context of the Bankruptcy Code as a whole.

## 1. Statutory Context

We find numerous contextual indicators in the Code that point to the petition date as a cutoff for analysis of the new value defense. First, as a general matter, § 547 is titled "Preferences," and therefore suggests that it concerns transactions occurring during the preference period, which is by definition pre-petition (i.e., the 90 days before the filing of the petition). It would make sense that the calculation of the amount of the preference, and application of any new value reduced by subsequent transfers, would relate to that time period.[5]

---

[5] We also note that post-petition transactions and the avoidance of post-petition transfers are separately dealt with in § 549 of the Code. The post-petition transfer pursuant to the Wage Order would appear to be unavoidable as analyzed under § 549, as it was specifically authorized by court order. *See* 11 U.S.C. § 549(a)(2)(B). How can we then say it has the pernicious effect of creating, if you will, a pre-petition preference? Would not this at least send mixed signals that are ill-advised, if not illogical?

Second, Appellee urges that the fact that the preference test known as the "hypothetical liquidation test" must be performed as of the petition date points to that date as the cutoff for determining new value. We agree. The hypothetical liquidation test requires courts to compare the payment received by a creditor during the preference period with what the creditor would have received if the payment had not been made and the debtor's assets were liquidated and distributed to creditors "to the extent provided by the provisions of [the] title." 11 U.S.C. § 547(b)(5). Courts have held that this test should be performed as of the petition date even though the statute does not specify the date to be used. *See, e.g.*, *In re Union Meeting Partners*, 163 B.R. 229, 237 (Bankr. E.D. Pa. 1994) (holding that hypothetical liquidation analysis must be conducted as of date bankruptcy petition is filed); *see also* 5 Collier on Bankruptcy ¶ 547.03 (16th ed. 2013) (stating that § 547(b)(5) codifies holding from *Palmer Clay Products Co. v. Brown*, 297 U.S. 227 (1936), in setting petition date as date to be used in hypothetical liquidation analysis). Extending preference analysis past the petition date would be inconsistent with § 547(b)(5).

Third, the statute of limitations for filing a preference avoidance action under § 547 in a voluntary case begins to run on the petition date.[6] This supports the notion that the

---

[6] The statute of limitations reads:

(a) An action proceeding under section . . . 547 . . . may not be commenced after the earlier of—
    (1) the later of –
        (A) 2 years after the entry of the order for relief; or

cause of action accrues as of that date. *See* 11 U.S.C. § 546. If Congress had intended to allow for post-petition transactions to affect the impact on the estate, it is likely that it would have crafted a different statute of limitations. The fact that the statute of limitations for a preference avoidance action under § 547 generally begins on the petition date suggests that the calculation of preference liability should remain constant post-petition. If we read § 547(c)(4)(B) to allow post-petition payments to defeat a new value defense, the calculation of preference liability could change depending on when the preference avoidance action was filed.

Fourth, Appellee argues that extending the preference analysis past the petition date would be inconsistent with the "improvement-in-position" test articulated in § 547(c)(5). This provision provides a defense from preference liability for a creditor with a floating lien on a debtor's inventory and receivables, so long as the creditor did not improve its position during the preference period. Notably, the provision

---

(B) 1 year after the appointment or election of the first trustee . . . if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2) the time the case is closed or dismissed.

11 U.S.C. § 546(a). In a voluntary case, the commencement of the case constitutes an "order for relief." *Id.* § 301(b).

20

includes the phrase "as of the date of the filing of the petition." Appellee avers that because Congress specifically articulated an intention—in an analogous defense to preference liability—to confine the analysis to pre-petition activity, we should assume it had the same intention with respect to the new value defense. The converse could be argued, however; namely, that this omission from § 547(c)(4) was intentional, since Congress knew how to set forth a relevant time period when it thought it applied. Still, on balance, we believe that the policy of improvement of position prior to the petition date is central to the concept of preference. We find this provision to bolster our reasoning

Lastly, if we allow post-petition payments to affect the preference analysis, it would seem logical also to consider post-petition extensions of new value to be available as a defense. However, the vast majority of courts that have considered this issue have concluded that new value advanced after the petition date should not be considered in a creditor's new value defense. *See In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1284-85 (8th Cir. 1988); *In re Rocor Int'l, Inc.*, 352 B.R. 319, 333 (Bankr. W.D. Okla. 2006); *In re George Transfer, Inc.*, 259 B.R. 89, 96 (Bankr. D. Md. 2001); *In re Sharoff Food Serv., Inc.*, 179 B.R. 669, 678 (Bankr. D. Co. 1995)*; In re D.J. Mgmt. Grp.*, 161 B.R. 5, 6 (Bankr. W.D.N.Y. 1993); *In re Jolly "N," Inc.*, 122 B.R. 897, 909-10 (Bankr. D.N.J. 1991); *In re Vunovich*, 74 B.R. 629, 632 (D. Kan. 1987); *see also In re Kumar Bavishi & Assocs.*, 906 F.2d 942, 951 n.9 (3d Cir. 1990) (Cowen, J., dissenting) (noting trend among courts to exclude post-petition advances of new value from preference analysis); 4 Norton Bankruptcy Law and Practice 3d § 66:36 (2013) ("[P]ostpetition extensions of unsecured credit to the debtor are not

21

encompassed by § 547(c)(4) and may not be utilized to protect prior preferential transfers."). *But see In re Keydata Corp.*, 37 B.R. 324, 329 (Bankr. D. Mass. 1983) (approving without discussion setoff of post-petition service against pre-petition preferential transfers). Although § 547(c)(4) only specifies that new value be given to a debtor subsequent to a preference payment, courts have read the petition date into the statute as a cutoff. At least one court has found that the logic leading to the conclusion that post-petition new value should not be considered in the preference analysis also applies to the issue before us. *See In re Murray, Inc.*, No. 04-13611, 2007 WL 5595447, at *2 (Bankr. M.D. Tenn. June 6, 2007) ("[T]he Trustee would have the Court conclude that post-petition payments remain in play while post-petition advances of new value are excluded from the analysis under § 547(c)(4). Logically, and as a matter of statutory consistency, the Trustee's argument fails.").

While, as we noted above, a number of courts have come out the other way on the issue before us, none has made a convincing contextual argument. *See Furr's Supermarkets*, 485 B.R. at 730-34 (resting primarily on policy grounds, as we discuss below); *Login Bros.*, 294 B.R. at 300-301 (same); *In re MMR Holding Corp.*, 203 B.R. at 609 (stating that "[a]voidable is avoidable," and concluding that "[i]t simply does not matter that the avoidable transfer subsequent to the extension of new value is a pre- or post-petition avoidable transfer"); *In re D.J. Mgmt. Grp.*, 161 B.R. at 8 (rejecting argument that just because recovery of post-petition transfer is time-barred under § 549 means that it cannot be considered in calculating amount of preference). Thus we believe that the context of the Code supports the conclusion that post-petition

22

payments by a debtor do not affect a creditor's new value defense.

### 2. Policy

Appellant argues that the policies underlying the preference provision and the new value defense should compel us to conclude that post-petition payments defeat a new value defense. For the reasons that follow, we disagree.

The Supreme Court has articulated two policies underlying § 547:

> First, by permitting the trustee to avoid pre-bankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.

*Union Bank v. Wolas*, 502 U.S. 151, 161 (1991) (quoting H.R. Rep. No. 95-595, at 177-78, U.S. Code Cong. & Admin. News 1978, pp. 6137, 6138). The Court has also stated that it is not our role to second guess how Congress has balanced these sometimes competing policies in different provisions of the Code. *See id.* at 162 ("Whether Congress has wisely

23

balanced the sometimes conflicting policies underlying § 547 is not a question that we are authorized to decide.").

While the Supreme Court cites to Congressional records to capture the essence of the provision, we find a more complete quote from the Committee Report to be helpful:

> A preference is a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankrupt estate. The purpose of the preference section is two-fold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter 'the race of diligence' of creditors to dismember the debtor before bankruptcy furthers the second goal of the

> preference    section-that    of    equality    of
> distribution.

H.R. Rep. No. 95-595, at 177-78, U.S. Code Cong. & Admin. News 1978, pp. 6137, 6138. Notably, this explanation of the purpose focuses on the pre-petition period: "to deter the 'race of diligence' of creditors to dismember the debtor before bankruptcy furthers the . . . goal of . . . equality of distribution." *Id.* We require those who received "a greater payment than others of his class to disgorge so that all may share equally." *Id.* Thus, it makes sense that the equality should be measured, and inequalities rectified, as of the petition date.

The new value defense as part of the preference analysis serves two underlying purposes. As we stated in *New York City Shoes*, "First, the section is designed 'to encourage trade creditors to continue dealing with troubled businesses. . . . Second, [it] is designed to 'treat fairly a creditor who has replenished the estate after having received a preference.'" 880 F.2d at 680-81 (emphasis omitted) (quoting *In re Almarc Mfg.*, 62 B.R. 684, 688 (Bankr. N.D. Ill. 1986)). Appellant mischaracterizes the objective of § 547(c)(4) in stating that "[t]he most relevant inquiry, and policy consideration . . . is whether the alleged new value replenishes the estate." Appellant's Br. at 15.[7] As Appellee points out, Appellant conflates the formula for calculating new value with the

---

[7] Appellant relies heavily upon the *Login Bros.* case in describing the policy behind the new value defense as one of replenishment to the estate. 294 B.R. at 301. We are not bound by the *Login Bros.* court's opinion, and we choose not to follow it for the reasons described.

objective of the new value defense, which is to "treat fairly a creditor" who provides new value. *New York City Shoes*, 880 F.2d at 681.

Appellant urges that if post-petition payments by a debtor are not considered in the Court's analysis of a creditor's preference liability, the creditor will receive a "windfall" and will be unjustly favored over other creditors. *See* Appellant's Br. at 15. Appellant argues that the debtor's estate is not replenished when the debtor makes a transfer to the creditor after the petition date, and that the creditor unfairly receives double payment, once post-petition, and "once indirectly as an offset against its . . . preference liability to the estate." *Id.* at 16. Appellant cites a number of cases in support of this proposition. *See, e.g.*, *In re T.I. Acquisition, LLC*, 429 B.R. at 385 ("Allowing BOTH new value credit and payment of [a] § 503(b)(9) claim elevates the claim of that creditor and results in double payment to that creditor."); *Login Bros.*, 294 B.R. at 301 ("[T]he policy behind the new value exception—that the estate be replenished by the new value—would be defeated if a creditor were allowed to keep a preferential payment of its debt on account of a new value contribution to the estate and also receive repayment of that contribution."); *In re MMR Holding Corp.*, 203 B.R. at 609 (stating that without considering post-petition transfers on account of new value in calculating new value offset, "the transferee would be receiving double use of the new value (once as consideration for the unavoidable transfer which effects a dollar-for-dollar reduction, and once as an offset to the prior preference which would also reflect a dollar-for-dollar reduction)").

However, this "replenishment" argument misses the mark. First, it is clear that even if a creditor is paid post-petition for new value it provided pre-petition, the creditor still replenished the debtor's estate during the preference period, and therefore aided the debtor in avoiding bankruptcy to whatever extent possible. *Cf. In re Commissary Operations, Inc.*, 421 B.R. at 878 ("[T]he possibility that a debtor may pay a creditor's § 503(b)(9) claim post-petition does not negate the value represented by the claim that the creditor provided to the debtor. The deliveries benefit the estate. . . regardless of whether the § 503(b)(9) claimants are paid at a later date for those deliveries."). Second, Appellant's reference to a creditor's "double dipping" is misleading because it implies that the creditor is receiving payment for goods or services that were never provided, or that the creditor is being paid twice. By examining Appellant's argument in the factual context of the instant case, it becomes clear why the argument fails. Here, the creditor provided services on credit during the preference period. After the debtor's bankruptcy petition was filed, the trustee paid the creditor some of the money owed, pursuant to the Wage Order. All of the money the creditor received was for goods and services actually provided. The creditor, therefore, was never unjustly enriched as Appellant seems to suggest.

Appellant also urges that cutting off preference analysis at the petition date results in unequal treatment of creditors. Indeed, a number of courts have followed this line of reasoning in finding that post-petition events should enter into preference liability calculations. *See, e.g.*, *In re T.I. Acquisition, LLC*, 429 B.R. at 385 ("The [] policy consideration—equal treatment of creditors—weighs heavily in favor of denying new value credit for allowed and paid §

27

503(b)(9) claims."). One bankruptcy court in the District of New Mexico, presented with the exact question before us, came to this conclusion by applying different rules regarding the treatment of post-petition payments to a hypothetical preference recovery scenario and then adopting the rule that resulted in the most equal treatment of creditors. *Furr's Supermarkets,* 485 B.R. at 730-31. In *Furr's Supermarkets*, the bankruptcy court decided that treating post-petition events as relevant to § 574(c)(4) defenses would "result[] in absolutely equal treatment of all unsecured claims" and therefore was in accord with the policies underlying the Code. The court reasoned that a creditor who is repaid post-petition for new value should be treated identically to a creditor who is repaid pre-petition.

If it is a rule in bankruptcy that all creditors must be treated equally, surely the exceptions swallow the rule. It could be said that some creditors are treated more equally than others. There are special provisions for aircraft leases and shopping center leases, and some claims are given priority over others. The balancing of interests in, for instance, wage orders, has been held to justify the type of unequal treatment condemned in cases that would include the post-petition payment in the preference analysis. *See, e.g., In re Primary Health Sys., Inc.*, 274 B.R. 709, 709 (Bankr. D. Del. 2002) (holding payments pursuant to court order allowing debtor to pay employee wages and benefits to be out of reach of § 547). Inequality per se is not to be avoided; indeed, reasoned and justified inequality sometimes prevails, usually based on what is in the best interest of the estate.[8] For

---

[8] The Wage Order here specifically states that the relief sought is in the best interest of the Debtors and their estate.

this reason, the courts positing that the interpretation that "results in absolutely equal treatment of all unsecured claims" is the "most reasonable interpretation of section 547(c)(4)," *Furr's Supermarkets,* 485 B.R. at 734, are misguided.

Moreover, we submit that the cases ruling that post-petition payments should be counted so as to achieve "replenishment" and "equality" have lost sight of the real policy objectives as noted above. Nowhere is the goal or rationale of "replenishment" set forth. Nor is "equality" as such to be achieved. Rather, if a creditor has been preferred, he must "disgorge so that all may share equally." H.R. Rep. No. 95-595 at 178. In other words, it is all about deterring "the race of diligence," and setting things straight, before bankruptcy. As the Eighth Circuit Court of Appeals noted:

> The general avoidance portion of the Bankruptcy Code was intended to 'facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.' Nevertheless, the subsequent advance rule, section 547(c)(4), 'was not enacted to ensure equitable treatment of creditors, but rather is intended to encourage creditors to deal with troubled businesses.'

*In re Bellanca Aircraft Corp.*, 850 F.2d at 1280 (citations omitted).

In addition, we have held that the policy underlying § 547 is that of "equal distribution among *similarly situated* creditors." *In re First Jersey Sec., Inc.*, 180 F.3d 504, 511 (3d Cir. 1999) (emphasis added). As we noted above, the

Bankruptcy Code does not give equal treatment to the claims of *all* creditors, but rather carves out special treatment for creditors or claims of certain kinds. For example, § 503(b)(9) claimants, ostensibly similar to general unsecured creditors, are afforded priority status for administrative expenses. "Critical vendors," like Roth Staffing, can similarly be given preferred treatment under § 105 and § 363. A critical vendor who provided new value during the preference period need not be treated the same as another creditor who provided new value but is not considered by the debtor and the bankruptcy court to be a critical vendor post-petition. They are not similarly situated.

The scheme of the Bankruptcy Code contains numerous post-petition mechanisms for ensuring that similarly situated creditors are treated equally. For this reason, preference analysis need not account for post-petition activity. As the Bankruptcy Court stated, once a bankruptcy petition is filed, "the supervision of the case by the court, among other things, ensures that similar claims receive similar treatment." (App. 17) The bankruptcy court acts as a referee, capable of considering and weighing competing policy objectives in authorizing, for example, the Wage Order in the instant case. A bankruptcy court in the Middle District of Tennessee has noted:

> Closing § 547(c)(4) analyses at the petition is consistent with other Code remedies that only apply post petition. . . . [C]onsiderations change when the petition is filed and the debtor becomes a bankruptcy estate under the administration of the bankruptcy court and

30

subject to the scrutiny of creditors, committees, the U.S. Trustee, etc.

*In re Phoenix Rest. Grp., Inc.*, 317 B.R. 491, 497-98 (Bankr. M.D. Tenn. 2004).[9] Here, the Bankruptcy Court determined that it would be "in the best interests of the Debtors and their estates" to issue the Wage Order. Order Authorizing the Debtors and Debtors in Possession To Pay Prepetition Wages, Compensation and Employee Benefits Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, In re: Friedman's

---

[9] In a related case in accord with the bankruptcy court's decision, the district court distinguished post-petition payments made under a Critical Vendor Order from post-petition payments on a reclamation claim. *In re Phoenix Rest. Grp., Inc.*, 373 B.R. 541, 547-48 (M.D. Tenn. 2007). The court held that reclamation claims are unique because goods shipped subject to reclamation "are not the same money or money's worth, as goods shipped free of the seller's strings." *Id.* at 548 (internal quotation mark omitted). Essentially the court found that goods subject to reclamation do not truly enhance the debtor's estate since a debtor's conduct is limited by the "seller's strings." The court therefore concluded that a creditor could not assert a reclamation claim and a new value defense for the same money.

Here, we need not resolve the question of whether assertion of a reclamation claim should reduce a new value defense, as we are only considering the effect of payments made pursuant to a Wage Order (akin to a Critical Vendor Order). We acknowledge, however, that reclamation claims could be treated differently from other post-petition activities under the rule we are establishing the purpose of the Order.

31

Inc., No. 08-10161 (Bankr. D. Del. Jan. 28, 2008). If we allowed payments made pursuant to the Wage Order to increase Roth Staffing's preference liability, we would defeat. In effect, we would be giving with one hand and taking away with the other. The intended goal of the Order – to ensure "continued service, satisfaction and loyalty of [the debtor's] numerous Employees" – would not be served if the Debtor sought and obtained permission to pay wages to Appellee one week but then sued Appellee for a preference the next. Mot. of Debtors and Debtors in Possession for an Order Authorizing the Debtors To Pay Prepetition Wages, Compensation, and Employee Benefits Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code ¶ 43. We will not undermine the Bankruptcy Court's Order by including such post-petition activity in the preference liability equation. Instead, we will allow the Bankruptcy Code's provisions dealing with post-petition conduct to govern, as we believe Congress intended.

## C. *Kiwi Air*

As a final matter we address the applicability of *Kiwi Air*, 344 F.3d 311 (3d Cir. 2003), to this situation. Appellant argues that our opinion in that case requires us to take into account *all* material post-petition events in determining preference liability. *Kiwi Air*, however, only examines the "*unique* set of rights" created by § 365 (a provision regarding the assumption of contracts by a trustee) and § 1110 (a provision on security agreements, leases, and conditional sales of aircraft equipment and vessels), and addresses their interaction with rights created under § 547. 344 F.3d at 317 (emphasis added). In *Kiwi Air*, we held that the post-petition assumption of an executory contract under § 365 and a

32

stipulated order pursuant to § 1110, which both require a trustee to cure certain defaults, preclude a trustee from bringing a preference action to recover pre-petition payments made pursuant to the contract. *Id.* at 314. We reasoned that, insofar as § 365 and § 1110 entitle creditors to receive unpaid pre-petition payments in connection with the assumption of the contract and curing of defaults, allowing recovery of a preference payment would thwart their effect. *Id.* at 321. In particular, we emphasized that the debtor's assumption of contracts was "important because it enabled [the debtor] to compel its creditors to continue performing under the assumed agreements, for the purpose of receiving contract benefits necessary to its operation." *Id.* at 314. To the extent that § 365 enables bankrupt companies to continue to operate, it serves a similar purpose to § 363, one of the statutes upon which the Bankruptcy Court relied in granting Appellant's Wage Order. If anything, *Kiwi Air* teaches that post-petition events can cast the payment in a different light in order to effectuate the purposes and provisions of the Code. Here, that translates into a directive that we should not undermine the purpose of the Wage Order. This is best accomplished by precluding post-petition payments made pursuant to the Wage Order from consideration in preference liability analysis.

*Kiwi Air* demonstrates that there are unique circumstances in which other provisions of the Bankruptcy Code dealing with post-petition transactions directly interact with § 547 and thus can alter the otherwise straightforward preference analysis. As with the entry of the Wage Order, the assumption of a contract involves a "unique set of rights" that warrants different preference treatment of creditors not similarly situated. We, therefore, view the import of *Kiwi Air* to be more helpful to Appellee than to Appellant.

33

**IV. Conclusion**

We hold that Appellant's post-petition payment pursuant to the Wage Order does not affect the calculation of Appellee's preference liability, pursuant to § 547. Accordingly, we will affirm the District Court's order.